IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DARYL ANDRUS, | ) | |
|     Plaintiff, | ) | ⌐ 5 1 |
|     v. | ) | C.A. _____ |
| CORRECTIONAL MEDICAL SERVICES, Inc, | ) | JURY TRIAL DEMAND |
| LAWRENCE McDONALD, MD, | ) | |
| FREDERICK VAN DUSEN, MD, | ) | |
|  FREDERICK DURST, MD, | ) | |
| CANDY DIBBLE, | ) | |
| JOHN DOE (Specialist), | ) | |
| JOHN DOE 2 (Director) | ) | |
| CANDY DIBBLE, | ) | |
| TRACY WILKENS, | ) | |
| JANE DOE ("KC") | ) | |
| Defendants. | ) | |

**FILED**

APR 30 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

COMPLAINT

This is a civil rights action brought by Daryl Andrus, a pro se plaintiff ("Andrus") and a state prisoner of Delaware, pursuant to 42 USC sections 1983 and 1997. Andrus' complaint requests declaratory judgment, injunctive relief, and damages. Andrus claims that Defendants committed several distinct acts of deliberate indifference and/or acted with gross reckless disregard to Andrus' know and/or obvious serious medical needs in violation of his constitutional rights: specifically the Eighth and Fourteenth Amendment's Ban on Cruel and Unusual Punishment, the Constitutional Right to seek redress in the courts free of Retaliation, and any other state tort claims that are supported by the case facts.

JURISDICTION

1. The Court has jurisdiction over Andrus' claims of violation of his federal constitutional rights under 42 USC subsections 1331 (a), 1334, and supplemental jurisdiction over any state tort claims under 28 USC section 1367 and any other appropriate statutes.

PARTIES

2. Plaintiff, Daryl Andrus, is a state prisoner and is incarcerated at the Delaware Correctional Center ("DCC") during the events described in the instant complaint. DCC is an institution within the Delaware Department of Corrections ("DDOC"). Andrus comes as a pro se friend of the Court.

3. Defendant Correctional Medical Services, Inc. ("CMS") is a privately held corporation that was contracted by the DDOC in July 2005 (circa), and as of the date of this complaint is responsible for ensuring all facets of medical/mental health care and medical grievances for the prisoner population. CMS is sued in its individual and official capacities.

4. Defendant Lawrence McDonald, MD, ("McDonald"), is believed to be a general practitioner doctor who is employed with CMS and has been assigned to DCC during the events described herein. CMS appears to have assigned McDonald as its "Infectious Disease" doctor, and part of McDonald's duties include referring, enrolling, and rendering Chronic-Care Clinics for patients with Hepatitis C/Liver Disease ("HCV"), which includes HCV diagnosis, beginning initial HCV protocols, referral for specialty care/tests (e.g. Liver Biopsy), and/or enrolling one in the antiviral therapy. McDonald's exact duties, however, have yet to be discovered. McDonald is sued in his individual and official capacities.

5. Defendant Frederick Van Dusen, MD, is believed to be a general practitioner doctor who is employed with CMS and has been assigned to DCC during the events described herein. CMS appears to have assigned Van Dusen as a general doctor and part of Van Dusen's duties include referring, enrolling, and rendering Chronic-Care Clinics for patients (e.g. HCV, Hypertension, diabetes, and/or other chronic ailments), which includes diagnosis, treatment, referral for specialty care/tests, etc. Van Dusen's exact duties, however, have yet to be discovered. Van Dusen is sued in his individual and official capacities.

6. Defendant Frederick Durst, MD, is believed to be a general practitioner doctor who is employed with CMS and has been assigned to DCC during the events described herein. CMS appears to have assigned Durst as a general doctor and part of his duties include referring, enrolling, and rendering Chronic-Care Clinics for patients (e.g. HCV, Hypertension, diabetes, and/or other chronic ailments), which includes diagnosis, treatment, referral for specialty care/tests, etc. Durst's exact duties, however, have yet to be discovered. Durst is sued in his individual and official capacities.

2

7. Defendant Candy Dibble is believed to be employed with CMS in some capacity at the DCC Hospital during the events described herein. CMS appears to have assigned her to administrative/medical duties and part of her duties include responding to, investigating, and attempting to resolve inmate medical grievances; correcting deficient medical practices that were grieved; ensuring patients receive appropriate medical care, and/o implementing CMS's custom/policies. Her exact duties, however, have yet to be discovered. Dibble is sued in her individual and official capacities.

8. Defendant Tracy Wilkins is believed to be employed with CMS within its Delaware Offices during the events described herein. Wilkens is CMS's Ombudsman and part of her duties include responding to, investigating, and attempting to resolve inmate medical grievances; correcting deficient medical practices that were grieved; ensuring patients receive appropriate medical care, and/o implementing CMS's custom/policies. Her exact duties, however, have yet to be discovered. Wilkens is sued in his individual and official capacities.

9. Defendant John Doe (Specialist) is believed to be a specialist/surgeon who is employed by with CMS during the events described herein. CMS appears to have assigned John Doe (Specialist) to evaluate specialty medical referrals for surgery. His duties include evaluating and/or referring patients for needed surgery and/or specialty medical care (e.g. neurosurgery, etc). John Doe (Specialist's) exact duties and name, however, have yet to be discovered. He is sued in his individual and official capacities.

10. Defendant John Doe 2 (Director) is believed to be employed with CMS and assigned to the DCC Hospital as its on-site Director of Hospital Operations during the events described herein. CMS appears to have assigned him to administrative/medical duties and part of his duties include responding to, investigating, and attempting to resolve inmate medical grievances; ensuring patients receive appropriate medical care; supervising and training subordinates and/or implementing CMS's custom/policies. His exact duties, however, have yet to be discovered. John Doe 2 (Director) is sued in his individual and official capacities.

11. Defendant Jane Doe ("KC") is believed to be employed with CMS as a Nurse and is assigned to the DCC Hospital during the events described herein. CMS appears to have assigned her to general medical duties and part of her duties include receiving Sick-call Requests, evaluating same for emergencies, and responding and scheduling said Sick-call Requests according to the medical needs of the patient; ensuring patients receive appropriate medical care, and/o implementing CMS's custom/policies. She also carries general nursing duties, such as screening patients, dispensing medications, applying basic medical care, or managing patients' medical files. Her exact duties, however, have yet to be discovered. Jane Doe ("KC") is sued in her individual and official capacities.

3

FACTS

Count I: Denial of Reasonably Adequate Medical Care and Retaliation Claims for Seeking Redress [1]

12. Andrus suffers complications from his chronic HCV (i.e. mental confusion/fog), and mental and physical exhaustion, and significant impairment of his cognitive faculties associated with acute and continuous excruciating pain and muscle spasms from a serious spinal injury. Thus, despite Andrus filing multiple formal Sick-Call Requests and Medical Grievances requesting much needed medical care for his serious medical conditions and documenting relevant events, the dates set forth below are approximate.

13. Defendants CMS, Van Dusen, Durst, McDonald, Candy Dibble, Tracy Wilkins, John Doe (Specialist), John Doe 2 (Director), and Jane Doe ("KC") intentionally or with gross reckless disregard to Andrus' known and/or obvious serious medical condition, **denied, inordinately delayed, or knowingly provided less efficacious and/or contraindicative medical care** (i.e. chronic-care medications) ("Deny or Denial/delay...CC-Meds" shall refer to the highlighted portion of this paragraph), for Andrus' spinal injury and its residual tangible injuries. Defendants' acts or omissions were contrary to legitimate medical factors and did cause Andrus undue, significant pain and suffering, residual tangible injuries, likely significant threat of future health, and significant impairment of Andrus' normal daily activities.

14. Andrus suffers a serious spinal injury and related residual tangible injuries to his lower extremities from a gun-shot wound he suffered to his back in April 1994 (circa). Some but not all of the residual injuries include the following:

    a.   Significant and persistent dysfunction of ambulatory and normal daily activities (e.g. Unable to walk, sit, stand, for periods longer than fifteen or twenty minutes at a time; acute insomnia and sleep disruption; unable to lift or move weights in excess of ten pounds; etc);

    b.   Partial paralysis of his right leg and foot at the L 1 level;

    c.   Depression and anxiety;

    d.   Multiple trauma to spine (i.e. L 1, L 2, and fusion of L 1 to L 3);

---

[1] Though Andrus structures his complaint with separate claims, he does not wave any claims that may be supported under the facts presented.

4

    e. Continuous, excruciating pain –sharp, stabbing, and burning pain throughout right leg and foot-
and acute, sudden and violent involuntary muscle spasms in and about right leg and foot ("acute
muscle spasms");

    f. Fusion and scar tissue from bone graft over right pelvis; and

    g. Significant impairment of lower extremity strength (i.e. two fifths strength –proximity- in right
leg with a drop foot gait on right side). ("serious spinal injury or injuries" shall reference items a.
thru g. of this paragraph).

15. In order for Andrus to manage the continuous, excruciating pain and sudden, acute and violent
involuntary muscle spasms, Andrus requires significant, adequate, and continuous medications for his
serious spinal injuries. (e.g. pain relievers "Elavil/Ultram" and muscle relaxers "Soma" since 2001, and
nerve damage meds "Neuroton" since 2006) ("CC-Meds"), Even with uninterrupted CC-Meds, Andrus is
still partially disabled; however, **when Andrus is denied any dosage of any one of these needed CC-
Meds, it renders him completely disabled and incapacitated due to the continuous, excruciating
pain and acute, sudden and violent involuntary muscle spasms.**

16. Andrus' serious spinal injuries are well documented and known by Defendants to be a serious medical
condition, because of the following:

    a. They have been diagnosed by multiple physicians as requiring significant and continuous CC-
Meds, physical therapy, and other specialty care;

    b. They have been documented via multiple Sick-call referrals, medical grievances, and Defendants
have responded and acknowledged same as a serious medical condition;

    c. Andrus has been enrolled in the Chronic-care Patient program due to the permanent and serious
acute nature of his serious medical condition; and

    d. Andrus' serious spinal injuries - excruciating pain and acute muscle spasms- are so obvious that
even a layman could easily discern the need for a doctor's immediate attention.

17. Indeed, when CMS denies Andrus any dose of said CC-Meds (i.e. interrupts CC-Meds) or they are
substituted for less efficacious or contraindicative medications, his condition immediately becomes a dire
emergency -due to the acute pain and suffering, and significant impairment of his normal daily activities-
and he consequently experiences the following: Andrus becomes incapacitated and bed ridden; he is often
unable to walk to the central meal hall and retrieve his meals and is thus forced to skip many of his meals;
he is unable to sleep, stand, walk, sit, or move about without experiencing debilitating and incapacitating
pain; he experiences acute muscle spasms that expose him to falling or collapsing incidents and likely

5

future injury; and he simply cannot function as any normal person would. This level of continuous and excruciating pain is substantially similar to torture and does cause Andrus significant mental and emotional suffering and mental and physical exhaustion in addition to the above stated acute pain and suffering. ("**acute pain and suffering**" shall refer to paragraphs 14 & 17 above).

18. Lack of adequate and consistent medical care unnecessarily exposes Andrus to unacceptably high and likely risks of permanent disability and/or fatal or serious injuries in the following manner:

A) *Likely and Substantial Risk of Serious Falling Incidents*: Andrus has already suffered additional permanent injury due to a related serious falling incident that caused his L5 to totally collapse. The falling incident occurred on or about mid-to-late 2001, and it was caused when Andrus experienced one of his frequent acute muscle spasms in his right leg. It in turn caused his leg to involuntarily and uncontrollably contract upwards like a folding jack-knife closing in on itself and up into his chest area. At this time, Andrus was not receiving any muscle relaxers or nerve damage treatments (i.e. medications), but only received pain meds as part of his CC-Meds. Andrus would experience such muscle spasms repeatedly and frequently throughout the day and night. Indeed, they would frequently jolt him wide awake in severe pain and only permitted Andrus a few forty-five minute increments of sleep a night, which totaled approximately 3-4 hours per evening. This is well known. Accordingly, Andrus was exposed to violently flipping out of his bunk, Prison Officials wrote an Order mandating that Andrus must always be provided a "Bottom Bunk," which of course is closer to the concrete floor and presumably less dangerous upon falling.

This particular serious fall, however, caused Andrus to be hospitalized for ten days under heavy sedation/medications. First Correctional Medical ("FCM") refused, however, to render any diagnostic tests that were needed to diagnose any additional spinal injuries (e.g. X-ray, MRI, etc). FCM did add the obviously necessary muscle relaxer "Soma" and nerve meds to Andrus' CC-Meds combination. (i.e. Soma and Elavil, etc). Said combination clinically proved a marked improvement. Andrus still suffered repeat muscle spasms, though they were less frequent and less in duration and severity. In short, with adequate and consistent CC-Meds treatment, Andrus was able to manage his pain and suffering.

Andrus received a subsequent MRI. The MRI revealed that the L5 of Andrus' spine was completely collapsed. Prior to said serious falling incident/injury, Andrus' L5 showed no damage and Andrus had not re-injured his back or spine since his 1994 neurosurgery except for this serious falling incident.

6

Thus, the actual and proximate cause of Andrus' permanent L 5 injury was the –untreated- acute muscle spasm. Moreover, during this period Andrus had significant nerve damage and numbness, but as time progressed (i.e. currently), Andrus actually suffers greater pain and more intense and frequent muscle spasms, because his right leg/foot and the nerves that serve them are finally beginning to heal and what was once dead and numb is now alive and acutely painful. Any Denial/delay…CC-Meds that CMS causes Andrus greatly aggravates his acute pain and suffering.

B) *Incredible Stress & Strains Upon Andrus' Compromised Heart and Poor Health*: Andrus also suffers chronic hypertension and a recent EKG showed signs that he suffered a recent hearth attack. Any time CMS Denied/delays…CC-Meds for Andrus' acute and serious spinal injuries he immediately experiences "acute pain and suffering" that wreaks havoc and incredible strain upon his physical, mental, and emotional person.

The following is an example:

> ➢ Stresses his already compromised heart;
>
> ➢ Spikes his already chronic hypertension, which in turn may cause likely further damage to his compromised heart and/or his kidneys;
>
> ➢ Causes significant sleep disruption, which weakens his immune system and thus aggravates his chronic Hep C/liver Disease ("HCV"), and causes Andrus to suffer acute irritability, hostility, anxiety, paranoia, depression, chronic fatigue, and frustration (i.e. significant mental and emotional distress); and
>
> ➢ It significantly impairs Andrus' ability to promote good health via exercise and/or realize much needed physical therapy for his spinal injuries.

Andrus' acute pain and suffering produces continuous, incredible, and unbearable strain upon his physical and mental person. And it is so obvious, and/or documented and tangible, that any layman would recognized the need for immediate medical attention any and every instance that CMS causes a Denial/delay…CC-Meds for Andrus.

19. Andrus' serious spinal injuries continues to require said CC-Meds, however, Defendants routinely deny it, or cause repeat inordinate delays and/or Defendants knowingly provide Andrus less efficacious and/or contraindicative medications. ("**Deny/delay…CC-Meds**"). These acts or omissions expose Andrus to said acute pain and suffering; however, absent any legitimate medical reasons.

20. It is believed and therefore averred that each of the above named Defendants (at item 13), were directly responsible for providing medical care to Andrus –care that was needed but repeatedly denied, etc during

7

the time below and actually knew or should have known that Andrus suffered a serious spinal injury that required significant, adequate, and consistent medical care to prevent Andrus undue acute pain and suffering, and/or associated complications, and substantial risk of future injuries via falling or collapsing incidents, or the likelihood of further disability.

21. It is believed and therefore averred that CMS's profits are inescapably dependant on restricting access to adequate and consistent medical care (e.g. CC-Meds), prescription drugs, outside-hospital care or specialty care that Andrus needed, but was repeatedly denied.

22. It is believed and therefore averred that CMS employed a "custom/policy" to intentionally Deny/delay…CC-Meds and other needed specialty medical care for Andrus with deliberate intent to harm and/or with gross reckless disregard to Andrus' known and obvious serious medical condition for reasons contrary to legitimate medical or penological factors: such as, but not limited to, constitutionally impermissible cost containment practices. Defendants realized CMS's custom/policy despite knowledge that its employment caused an obvious and substantial risk of causing Andrus undue acute pain and suffering, and which was likely to violate his constitutional rights.

23. It is believed and therefore averred that CMS's custom/policy was the moving force in denying Andrus appropriate and consistent medications and other needed specialty medical care (e.g. Orthopedic Walking Shoes, back or nerve surgery, and meaningful physical therapy).

24. It is believed and therefore averred that CMS is fully conscious that its current custom/policy regarding Chronic-care Medication Re-orders/Administration utterly fails to address the immediate needs of Chronic-care Patients ("Failed CC-Administration") –especially Andrus- however, CMS continues to employ this on going pattern of medical care being denied/delayed for non-medical reasons by virtue of the following:

   a. Sick-call referrals by Andrus;

   b. Medical grievances by Andrus;

   c. Complaint letters by Andrus, and third party intervention and prison officials' intervention;

   d. By the December 2006 Report and Agreement issued and signed by the US Justice Department and Delaware;  and

   e. By the follow up report from the State's Independent Monitor.

8

25. CMS engaged in three primary methods to deny, delay, and or intentionally provided Andrus known less efficacious and/or contraindicative CC-Meds: First for instance, CMS's CC-Med Administration (i.e. Chronic-care Clinics) is supposed to provide uninterrupted CC-Meds via (A) a ninety day Order/prescription of C-Meds, and (B) a subsequently –automatically scheduled- Clinic prior to the previous CC-Med order lapsing (i.e. before 90 days lapses). This normally results in four Clinics annually, but (1) *CMS consistently caused* Andrus' needed CC-Meds *to be interrupted* by failing to provide timely subsequent Clinics and *CMS thus caused repeat, prolonged, and unnecessary lapses in Andrus' CC-Meds between said Clinics without fail for nearly every ninety day cycle over the past thirty-two months.* This is despite the above notice and obvious failure of CMS's CC-meds Administration; (2) CMS frequently shorted Andrus' CC-Meds throughout the ninety day order for no valid reason other than the Nurse's claim to have merely forgotten it and thus repeatedly failed to carry out the treating physicians' orders. (3) Lastly, CMS –absent legitimate medical factors inntentionally substituted semi-effective CC-Med combinations for CC-Med combinations that it knew or should have known was less efficacious and/or contraindicative to Andrus' serious medical conditions.

26. In fact, Andrus repeatedly grieved this continuing and pervasive problem some seven times and the DDOC "Upheld" his medical grievance against CMS. For example:  MG # 17104 "Upheld," decided 9-06-05; MG # 35342, decided 04-24-06; MG # 64077, decided 8-23-06; MG # 73110, decided 9-20-06; MG # 104003, pending; MG # 152411, pending; and MG # 153108. Andrus exhausted his administrative remedies available to him. Nearly every MG represents an unnecessary and repeat denial of Andrus' needed CC-Meds and/or notice of a less efficacious or contraindicative CC-Med combination.

27. Consequently, CMS is well aware that continued employment of said failed custom/policy is so likely to violate Andrus' constitutional rights that affirmative action is mandated; however, CMS refuses to take any meaningful corrective action against its failed custom/policy or its employees (i.e. defendants) who readily realize said custom/policy.

28. CMS thus employs a well established culture of deliberate indifference and/or gross reckless disregard to Andrus' known serious medical needs and the other inmate Chronic-care patients.

29. CMS's dogged employment and refusal to correct its failed CC-Administration (i.e. custom/policy) is further aggravated through willful deception and false claims, which CMS employs in bad faith to obscure the on going and pervasive problem.

30. For instance, CMS recently employed shocking and constitutionally impermissible behavior in direct response to Andrus' efforts to seek redress (i.e. grievance activity) and Andrus' attempts to realize meaningful medical care.

9

31. CMS's adverse acts are a direct violation of IGP 4.4 and Andrus' protected right to seek redress and secure adequate medical care and/or file claims in the Courts.

32. For example, Andrus filed his sixth medical grievance (e.g. MG # 152411), regarding the denial of needed chronic-care medications ("CC-Meds"), and seventh (e.g. MG # 153108), because CMS inexplicably altered his needed pain meds for a known less efficacious over-the-counter medication. In response, CMS investigated the grievance via Defendant Candy Dibble.

33. Dibble subsequently threatened and attempted to coerce Andrus into dropping his medication grievance (i.e. redress) and the pursuit of adequate medical care via threats of a non-existent policy to transfer Andrus to the Maximum Housing Unit (i.e. punitive housing unit) or the SNU. (See MG # 154584 at A-1). (* Note the MG incorrectly assumes the investigator was the investigator labeled on the Grievance, Ronnie Moore, but Andrus later learned that the actual person he saw was Dibble).

34. Thus Dibble intentionally sought to deny Andrus both his right to seek redress without fear of retaliation of punitive transfer and his right to seek reasonable medical care, and Dibble's act or omissions were clearly absent any valid medical or penological factors.

35. Additionally, Andrus wrote a complaint letter to CMS Delaware Offices and informed CMS of this most recent incident. (See A-2, March 17, 2008, Complaint Letter). In response, CMS ombudsman Tracy Wilkens made preposterous and false claims in a bad faith effort to attack the victim –Andrus- and distort the facts of the matter. (See Attachment A-3, March 28, 2008 CMS Reply). Thus Wilkens intentionally sought to deny Andrus both his right to seek meaningful redress and his right to seek reasonable medical care, and Wilkens' acts or omissions were knowingly made to obscure to this on going and known problem absent any valid medical or penological factors.

36. Therein, Wilkens claimed that Andrus' Nurse Administered CC-Meds did not show any interruption and she supports her claim by stating that CMS provided a timely Clinic (i.e. before the expiration of 90 days) on March 05, 2008. This is preposterous and false. [1]

37. First, Wilkens points out that Andrus' previous Clinic was provided on 11-15-07, thus it follows that a Clinic to "re-order" his CC-Meds would have had to of been provided before 2-15-08 (i.e. within 90 days), -not 3-05-08- to have been "timely." (i.e. Not lapse). It is clear by the very dates Wilkens provides that her claim is preposterous and false.

---

[1] CC-Clinics are typically scheduled automatically, by CMS hospital staff- before ninety days elapses because a normal CC-Meds Prescription is placed for lots of 90 days worth of doses. Naturally, if an order is made for only 60 days, then the following Clinic would necessarily be provided before 60 days elapses.

38. In addition, Wilkens falsely claimed that Andrus refused his Lactulose (unrelated med) and a physical therapy ("PT") session on 03-20-08. This is equally false. Andrus has been taking the Lactulose each and every day that the Nurse remembered to bring it for Administration, and the only time he did not take it was due solely to the Nurse failing to bring it and administer it to Andrus.

39. Also, Andrus attended the 3-20-08 PT session with Sean contrary to what Wilkens claimed. Indeed, had Andrus not done so, then he would have been required to sign a "Refusal" form or face Disciplinary Action for not attending a mandatory medical scheduling, which is DCC policy.

40. There is no signed Refusal form and Andrus did not receive any disciplinary action because he attended the 03-20-08 PT session.

41. Moreover, the S-1 and the Hospital "Destination/Log Sheets clearly demonstrate Andrus attended his mandatory medical scheduling. Wilkens' false claims are a bad faith and shocking attempt to blame and attack the victim in this matter, and moreover, Wilkens intentionally obscures the problem in order to avoid taking affirmative action to correct it as any legitimate ombudsman would do. She is nothing more than CMS's spin doctor who intentionally ignored and refuses to address and/or correct CMS's custom/policy, which is causing Andrus undue pain and suffering.

42. Lastly, Wilkens refers to a per se custom/policy that "Ultram" (pain reliever) is no longer available to patients. A per se policy that fails to consider Andrus' particular serious medical needs is absent legitimate medical factors and thus arbitrary and capricious (i.e. violative). Moreover, Wilkens conveniently avoids that fact that a suitable alternative exists, which Andrus has been prescribed on prior occasions (e.g. Soma), and she avoids the fact that it is known that the over-the-counter Tylenol is wholly ineffective at managing Andrus' acute pain and muscle spasms.

43. This is well known by several of Andrus' treating physicians. Consequently, whether Tylenol is contraindicative to Andrus' chronic Hep C disease or not is irrelevant to the known fact that it is wholly ineffective; irrelevant to Andrus' known legitimate medical factors and his known serious medical condition.

44. CMS, however, began its constitutionally impermissible custom/policy immediately upon accepting the DDOC contract as DDOC's medical vendor in July 2005, and CMS subsequently employed deception to mislead and obstruct Andrus' ability to (a) realize adequate medical care or (b) seek redress for CMS's acts and omissions.

45. The prior medical vendors (e.g. PHS and FCM) had already experimented with several types over-the-counter and stronger pain and muscle relaxer medications (e.g. Motrin, Ibuprofen, Tylenol, Tylenol with

Codeine, and Ribaxion), but these combinations proved clinically ineffective and also aggravated Andrus' HCV and/or adversely affected him (i.e. They were either knowingly contraindicative and or caused Andrus severe stomach distress and internal bleeding).

46. Subsequently, FCM prescribed a non-contraindicative medication combination (i.e. pain reliever Elavil (50 mg) and muscle relaxer Soma) for Nurse Administration at three intervals daily.

47. Andrus was not entirely pain or muscle spasm free, but this combination of CC-Meds clinically proved the most effective to date at managing his acute pain and suffering –relative to prior combinations- and also had less adverse side effects.

48. Three intervals per day clinically proved insufficient, however; and treating physicians' ultimately prescribed Andrus the Nurse Administered CC-Meds at four intervals per day. The Elavil/Soma combination permitted Andrus to begin a self-administered physical therapy ("SPT") and exercise program for the first time in years, and it greatly improved his quality of life and aided the healing process (i.e. relearning to walk and helped with his coordination, etc).

49. CMS, however, became DDOC's medical vendor in July 2005, and at its first opportunity CMS promptly and with wonton disregard to Andrus' documented acute pain and suffering, cut Andrus' prior dosage of Soma by half and completely denied the needed pain med, Elavil. This was contrary to the known legitimate medical factors.

50. These acts and omissions were the first indication of what ultimately proved to be a continuous pattern by CMS to Deny/delay…CC-Meds and/or any other viable medical alternatives to Andrus. Defendants CMS, Durst, and McDonald were the actors who employed CMS's custom/policy during this early period.

51. Shortly after discontinuing the Elavil, these same defendants then denied Andrus the already cut in half Soma completely.

52. CMS predictably caused Andrus undue acute pain and suffering; the muscle and nerve pain was simply unbearable; he became bed ridden and unable to walk to the central meal hall and was thus forced to miss needed meals. Andrus was also forced to discontinue his SPT and exercise program that had proved so beneficial, because he was incapacitated completely and utterly from the excruciating pain. Between 07-24-05 and 09-23-05, Andrus filed no less than six formal Sick-call Requests ("SCR") to CMS and begged CMS for them to renew his CC-Meds, begged for orthopedic foot wear, and/or requested that CMS provide neurosurgery to correct his nerve damage. Nearly every SCR represents an

12

unnecessary and repeat denial of Andrus' needed CC-Meds and/or notice of a less efficacious or contraindicative CC-Med combination.

53. Once a patient –like Andrus- is enrolled in the Chronic-care Program, the Clinics are to be automatically scheduled by CMS hospital staff, so it was unnecessary for Andrus to have to continuously file formal requests for Clinics, but because CMS caused repeat, prolonged, and pervasive Clinic/CC-Meds Denials/interruptions, Andrus experienced acute undue pain and suffering repeatedly and unnecessarily.

54. Andrus' acute pain and suffering became so intense and constant by August 2005, that it resulted in recurring episodes of convulsions and hyperventilation. He also experienced significant sleep disruption from the continuous pain and acute muscle spasms: likely to only sleep for a few forty-five minute increments between the acute physically exhausting and painful muscle spasms that raked his body involuntarily throughout the night.

55. In short, Andrus was completely incapacitated and literally delirious; he was physically and mentally exhausted, humiliated and broken, and only because CMS capriciously and maliciously employed a custom/policy to Deny/delay…CC-Meds to Andrus -meds that Andrus desperately needed.

56. Andrus' situation was dire and clearly an emergency; any layman could easily observe that Andrus required immediate, emergency medical care. CMS's custom/policy caused Andrus to suffer repeat *torture-like episodes over a thirty-three month period.*

57. Sometime during the above two month period of torture, Andrus received a 30 day order for a known ineffective dose of Baclofen. Also, during the latter part of said period, CMS substituted the effective Soma for a wholly ineffective muscle relaxer Parafon Forte. It caused Andrus to experience acute adverse reactions and it is believed and therefore averred that the Parafon Forte is a known contraindicative medication for HCV patients. Andrus was forced to discontinue its use within two weeks.

58. Andrus' mental state was severely impaired, thus he cannot recall or reconstruct much of the exact detail during this period and he will have to do so with the aid of counsel and comprehensive discovery.

59. Consequently, Andrus filed a forma medical grievance ("MG") (i.e. MG # 17104) on or about 8-01-2005; and despite the fact that said medical condition was considered an "Emergency" under applicable DDOC Inmate Grievance Procedures ("IGP"), and which mandated be addressed within 24 hours, CMS refused to even investigate the emergency medical claims/grievance until 11-03-05 in direct violation of mandatory medical IGPs (e.g. over 90 days later). This suggests conscious and reckless disregard for a known emergency medical need.

60. Also, mandatory IGPs explicitly require any grievance to be resolved within 180 days and this necessarily includes two requisite grievance hearings, an appeal, and a Final Appeal Decision from the Bureau Chief Officer ("BGO"); however, CMS obstructed the grievance process and refused to conduct the requisite hearings until January 2006 (circa), and Andrus did not thus receive a final decision until August 15, 2006 (over 365 days after initial receipt).

61. Thus, CMS created an impermissible extraordinary obstruction that prevented Andrus from exhausting the requisite administrative remedies and this actively prevented Andrus' claims from becoming ripe until August 15, 2006.

62. Also, CMS's active Denial/delay…CC-Meds caused Andrus to literally be incapacitated and delirious with acute pain and suffering during this and subsequent periods –so much so- that this too created an extraordinary situation that actively prevented Andrus from presenting his otherwise unripe claims before now.

63. Indeed, if it was not for the assistance of another inmate, Andrus would still be physically/mentally unable to prosecute his claims. Andrus is so completely incapacitated that his assistant is overwhelmed with the task of reconstructing the events herein. Andrus is of very limited help and/or he suffers substantial impairment of his cognitive facilities.

64. Additionally, CMS actively deceived Andrus with false and misleading representations in direct response to Andrus' MG(s), which further aggravated and prevented Andrus from asserting his claims against CMS earlier.

65. For example, Andrus grieved on 08-01-05 CMS's Denial/delay…CC-Meds and requested the following:
> [A] plan for physical pain medication[s] and [physical] therapy…, cane
> to help walking and sneakers. [i.e. orthopedic foot wear or quality walking
> shoes] [or] If not possible[,] surgery to help correct nerve damage….

66. On 11-03-05, CMS admits that "there has been no movement on [Andrus'] grievance…investigate…."

67. On 05-23-06, CMS held the requisite RGC/MGC Second Level Hearing and therein CMS arbitrarily and maliciously denied Andrus' reasonable requests for immediate, emergency care and/or adequate and consistent CC-Meds; denied Andrus' reasonable request for a cane; and denied his reasonable request for orthopedic foot-wear or quality walking shoes.

68. Incredibly, CMS underscored a per se custom/policy by stating that orthopedic foot-wear was "not issued by medical." CMS did not consider Andrus' observable legitimate medical factors, but alternatively offered a flat denial absent any legitimate medical considerations.

14

69. CMS, however, attempted to appease and/or stall Andrus' efforts to seek redress and the underlying medical care with misleading representations: That he could receive neurosurgery to correct his nerve damage, but not until he received an MRI and consult, and that during the interim Andrus would be rescheduled for a Chronic-care Clinic for medication "Re-evaluation." CMS's representations regarding the rescheduling/re-evaluation was absurd and unnecessary; it only created further unnecessary delays.

70. For instance, Rescheduled/Re-evaluation was not needed –and it was but a bad faith pretext employed to realize CMS's custom/policy of cost-avoidance - because Andrus' medical records already contained adequate medical/clinical information (i.e. Which CC-Meds worked and which did not). Moreover, CMS's custom/policy also failed to meet the immediate, emergency medical needs of Andrus' known and obvious dire condition.

71. For example, Andrus' medical records clearly document prior failed experiments with pain and muscle medication combinations and less efficacious and/or contraindicative medication combinations; clearly documented Andrus' diagnosed "serious acute spinal injuries" and the resulting acute pain and suffering, and also documented what med combinations clinically proved helpful, but without adverse effects. (i.e. Elavil, Soma, and Ultram).

72. Consequently, as of CMS's 05-23-06 hearing/representations, CMS was well aware of Andrus' dire, emergency condition; well aware of his immediate medical needs, and well aware that it did not require further unnecessary "Reschedulings" or Re-evaluations" which only served as a pretext to create inordinate Denials/delays…CC-Meds -denials that would never be made up or replaced, but created a windfall profit for CMS.

73. Moreover, CMS continued its pattern: custom/policy to "Deny/delay…CC-Meds to Andrus throughout July and August 2006, and Andrus was forced to file four more formal Sick-call Requests and again beg defendants to schedule him in to see a doctor (i.e. Durst) and reorder the withheld CC-Meds.

74. Indeed, Andrus' acute pain and suffering was so intense and debilitating that he suffered acute mental and emotional distress and also filed a formal Mental Health Request in July 2006.

75. He was forced to begin treatment for the resulting residual mental and emotional distress.

76. Subsequent to CMS's representation to provide a requisite MRI before the surgery consult, Durst promptly countermanded the MRI order. Durst would have been successful at denying said MRI and thus the surgery consult, but Prison Staff had inadvertently acted on the prior order and disregarded Durst's subsequent countermand.

15

77. Subsequently, CMS attempted to force Andrus to pay for the MRI procedure, presumably because it had been cancelled by Durst contrary to CMS's representations at the hearing.

78. It appears that the MRI and consult were but a pretext, but CMS's attempts were foiled by prison staff.

79. Thereafter, Andrus met an unknown doctor –purportedly a back specialist- who explicitly declared to Andrus that the neurosurgery Andrus sought as an alternative to CC-Meds was denied.

80. He -doctor John Doe (Specialists)- did not discuss the likely risks or benefits of the procedure; did not discuss the residual tangible damage Andrus still had or how it could be corrected via surgery; and did not discuss what –if any-amount of healing had occurred with Andrus either. He simply made a declaration absent any consideration of legitimate medical factors. It is believed and therefore averred that the neurosurgery denial was predetermined and thus absent any legitimate medical factors or sound professional judgment.

81. CMS did not provide a second opinion or any follow up despite Andrus' condition persisting continuously throughout the period described herein.

82. Consequently, at the Second Level Hearing in May of 2006, CMS actively mislead Andrus into believing it would provide (a) a legitimate medical consultation for neurosurgery , not a predetermined denial, (b) timely, legitimate, and consistent Chronic-care Clinics (i.e. Clinic rescheduling/re-evaluation for CC-Meds), and (c) a legitimate treatment plan, but all proved false and/or made in bad faith.

83. Andrus' medical claims/grievance were not exhausted until 08-15-06 (i.e. ripe for prosecution) and between 11-02-2005 and 8-15-2006, Andrus was forced to file seven more Sick-call Requests and two more Emergency Medical Grievances ("EMG") (e.g. EMG # 35343 and EMG # 64077), regarding CMS's continuing "Denial/delay…CC-Meds for Andrus' acute spinal injuries and his acute pain and suffering. All his efforts proved to no avail at persuading CMS to take affirmative corrective action.

84. CMS continued to employ said custom/policy and it was so painfully obvious and likely to violate Andrus' constitutional right to be free from cruel and unusual punishment that it mandated CMS to take affirmative corrective action, but despite CMS's knowledge of same, CMS intentionally refused to act at all to correct the acts and omissions of its employees and the resulting pattern of deliberate indifference.

85. In direct response to Andrus's two EMG(s) filed in August 2006, CMS continued to make false representations to "schedule" Andrus in for the needed, but denied or inordinately delayed Clinics with defendant doctors, but again CMS failed to realize timely or adequate Clinics despite the known failure of CMS's policy/custom to meet the immediate needs of Andrus' serious medical condition.

86. Indeed, Andrus was forced to nevertheless file three formal Sick-call Requests in September 2006 –the latest on 09-26-06- just to realize the Clinic CMS promised to provide, but did not, in August 2006. Nearly every SCR represents an unnecessary and repeat denial of Andrus' needed CC-Meds.

87. CMS continued to intentionally, wantonly, and/or with gross deliberate disregard for Andrus' known serious and acute pain and suffering Deny/delay…CC-Meds and/or any other suitable medical alternatives to Andrus absent any legitimate medical factors.

88. Andrus need not recite all the individual incidents CMS caused throughout 2006 and 2007, but offers the following summary of the identical Denials/delays…CC-Meds:

For example, between 01-16-07 and 03-17-08, CMS forced Andrus to file no less than seventeen unnecessary Sick-call Requests for Clinics, which are necessary to have his CC-Meds reordered and provided and thus correct CMS's on going and pervasive CC-Med interruptions/denials. Nearly every SCR represents an unnecessary and repeat denial of Andrus' needed CC-Meds and/or notice of a less efficacious or contraindicative CC-Med combination. Defendants Durst, Van Dusen, John Doe 2 (Director), Wilkens, Dibble, and McDonald  actively realized CMS's impermissible custom/policy during this period. Defendant doctors/health care staff who realized CMS's custom/policy to Deny/delay…CC-Meds and/or any other adequate alternative medical care for Andrus' serious acute spinal injuries and his acute pain and suffering –contrary to legitimate medical factors- have failed to exercise sound professional medical judgment and thus acted with deliberate indifference and/or gross reckless disregard to Andrus' known and obvious serious acute spinal injuries and his known acute pain and suffering.

89. CMS's acts/omissions, false and misleading representations, and custom/policy of "Denying/delaying…CC-Meds to Andrus are a continuing course of conduct that is inescapably interrelated to Andrus' denied CC-Meds and/or of needed medical care and his resulting "acute pain and suffering." It cannot be compartmentalized in applying any statute of limitations. It is enough to recite the most recent and substantially similar incidents in order to show the continuing violations and CMS's refusal to take affirmative action.

90. For example, on or about 02-13-08 Andrus's CC-Meds (i.e. Ultram, Neuroton, and Baclofen) *unnecessarily lapsed* and CMS failed to provide Andrus' needed CC-Meds until 3-11-08 (circa), and then only a partial CC-Med combination.

91. Andrus continues to require these CC-Meds because he still suffers significant residual acute spinal injuries and accompanying acute pain and suffering. In fact, because the once deadened nerves of Andrus' right leg and foot are now beginning to heal/rewire themselves, Andrus currently suffers a marked

17

increase in pain and suffering from the earlier periods (e.g. 2005-2007), because his left leg/foot are no longer partially numb but regaining life. Thus, Andrus now requires said CC-Meds much more now than he did before when physicians had first diagnosed/recognized his significant impairment and pain and suffering.

92. Andrus saw Defendant Vandusen on 03-05-08 and Vandusen inexplicable cut the Neuroton dose in half to 300 mg., renewed the Baclofen, but discontinued the very much needed pain med (e.g. Ultram) and alternatively prescribed a known ineffective and contraindicative over-the-counter Tylenol.

93. Andrus still experiences acute and constant stabbing and burning pain in his lower back and right leg and foot, and the sudden, acute, and violent muscle spasms in his right leg.

94. Andrus experiences constant and excruciating pain and is rendered incapacitated when he receives any interruption in his CC-Meds and/or alteration of them to a less efficacious CC-Meds combination.

95. For *twenty-eight days,* between February and March 2008, CMS intentionally refused to provide Andrus's needed CC-Meds; Andrus unduly experienced excruciating and incapacitating pain, acute muscle spasms, and substantial mental and emotional suffering that rendered him bed ridden: unable to walk to his meals, stand, sit, or walk for more than five minutes, unable to sleep for more than a few forty-five minute increments per night–and only then because Andrus passes out from emotional, mental, and physical exhaustion- and he experiences acute anxiety, frustration, and depression and mental anguish.

96. For example, Andrus was rendered unable to walk to get his meals and missed seven meals between 02-29-08 and 03-02-08. This aggravated his suffering because he became weak and exhausted from the excruciating pain and continuous muscle spasms.

97. Andrus had to get assistance form Security Staff (e.g. Lieutenant Salas); to bring Andrus a bag lunch to his housing unit because Andrus was unable to walk unaided.

98. Lt. Salas contacted the DCC Hospital and alerted them to Andrus's obvious pain and suffering and requested the hospital staff to provide Andrus the lapsed CC-Meds and/or the needed Clinic for the purpose of reordering the CC-Meds.

99. CMS Staff, however, informed Lt. Salas that the earliest Andrus could be seen was 3-10-08 and they refused to see or provide Andrus any alternative CC-Meds or Stock CC-Meds.

100.     Lt. Salas recommended that Andrus file an Urgent Sick-Call request for the needed Clinic.

101.     This was unnecessary though because Andrus had already filed multiple prior Sick-call Requests for the lapsed Clinic on or about 02-11-08, 02-20-08, and again on 03-03-08, but CMS refused to provide

Andrus the lapsed Clinic. CMS intentionally refused to provide the needed Clinic and thus denied Andrus his obviously needed pain medications.

102.      Moreover, said Clinics for Chronic-care patients are to be automatically scheduled by CMS Staff prior to any CC-Med lapse occurring, but CMS has and continues to cause unnecessary CC-Meds interruptions (CCMI) by failing to schedule or provide the requisite Clinics in a timely fashion.

103.      This is an on going and pervasive problem and Andrus has repeatedly grieved this very matter over the past thirty-three months, but CMS refuses to take any corrective action despite the obvious need to do so.

105.      Medical grievances, Formal Sick-call requests, Security Staff intervention, and citizen/family intervention have all failed to motivate CMS to take meaningful and corrective action.

106.      For example, Andrus's mother, Audrey Andrus, has on multiple occasions contacted any of the following entities in an effort to realize corrective action (i.e. relief/medical care) for her son, Governor Minner, Commissioner Taylor, and Wardens Carroll and Phelps.

107.      On 03-02-08, Mrs. Andrus refused to leave the prison's parking lot after she visited with Andrus and witnessed for herself the obvious pain and suffering Andrus was enduring. She demanded to speak to the Shift Commander about getting urgent medical care for Andrus's condition.

108.      On 03-03-08, Mrs. Andrus contacted Warden Phelps to follow up on her efforts of 03-02-08, and again attempt to get Andrus urgent medical care.

109.      Only after the Warden's Office subsequently contacted DCC Hospital Staff did CMS finally bring Andrus in to be seen.

110.      Andrus met the on-site DCC Hospital Director -Defendant John Doe 2 (Director) - and he was extremely abrupt, hostile, and contemptuous towards Andrus. He treated Andrus as a nuisance and not as a patient in a dire and emergency situation that obviously required needed medical care.

111.      The Director asked Andrus what CC-Meds he had been prescribed, but he only provided Andrus the Neuroton (i.e. nerve meds) and refused to provide Andrus any pain or muscle relaxers (i.e. Baclofen and Ultram).

112.      Andrus pleaded with the Director to provide him the necessary remaining CC-Meds, but he forcefully stated: This is all you're getting right now! You will see the doctor tomorrow."

113.      The Director/CMS did not, however, provide Andrus the promised Clinic -with the doctor- on the following day.

19

114.    CMS finally provided the long-belated Clinic on 03-05-08 with doctor Vandusen, but Vandusen
        also did not renew all the standard CC-Meds for Andrus despite the obvious need to, and he also
        discontinued the half dose Neuroton and failed to renew the Ultram.

115.    Vandusen alternatively prescribed –unilaterally and without Andrus's knowledge- Tylenol as a
        substitute for the Ultram despite knowing that Tylenol is both ineffective at managing Andrus's pain and
        it is believed to be and therefore averred contraindicative to Andrus's Hepatitis C / Liver Disease.

116.    Vandusen is intimately aware of Andrus's Chronic HCV and even noted Andrus's high ammonia
        levels at the very same Clinic which is a classic symptom that his HCV was aggravated and flaring up.

117.    Moreover, Andrus has received various alternatives –including Tylenol with codeine, etc- and
        found them all woefully ineffective at managing his excruciating pain, suffering, and muscle spasms, and
        consequently informed hospital staff and/or returned the less efficacious prescriptions.

118.    Andrus's current CC-Meds are by no means completely effective, but to date, they are the most
        effective and they have had the least side-effects.

119.    Moreover, Dr. McDonald, HCV doctor, informed Andrus that the Ultram was not
        contraindicative to Andrus's HCV as were the prohibited class of NSAIDS, so there was no legitimate
        medical factor for Van Dusen to discontinue the Ultram from Andrus' CC-Meds combination.

120.    On 03-22-08 Andrus met McDonald for an HCV Clinic and McDonald intentionally made
        several false statements in an effort to mislead Andrus.

121.    Andrus requested pain meds for his chronic spinal injury, because of the continuing denial and
        the resulting incapacitation due to continuous, excruciating pain.

122.    McDonald promptly attempted to prescribe a known contraindicative pain-med (i.e. Tylenol,
        which is believed and therefore averred to be a prohibited class of NSAIDS). Andrus' exploded: "What
        are you trying to do to me, Kill Me!" "You should know I can't have Tylenol." "All the drug info. I've
        read clearly warns against it for any one who suffers HCV or liver disease."

123.    McDonald became visibly nervous and stated: "Well, you can take up to a certain amount."

124.    Andrus retorted: "If it's bad for my already damaged liver –and since it is wholly ineffective at
        managing my high level of pain- then why should I risk taking any Tylenol at all?"

125.    McDonald then noted that Ultram is not a contraindicative class of pain meds and could be
        prescribed -actually had been prescribed for Andrus, but intentionally denied absent legitimate medical
        factors. McDonald asked Andrus' whether this pain med was more effective.

126.    Andrus replied that it was a relative gauge because his pain was constant under any condition, but
        that the Ultram was the most effective thus far and that it would be fine.

20

127.    McDonald explicitly represented to Andrus that he would place a renewed prescription/order for Andrus to receive Ultram, but Andrus later learned that McDonald did not place the Reorder.

128.    During the interim on 03-20-08 Andrus was scheduled for Physical Therapy ("PT").

129.    Andrus' prior PT had been conducted off-site at a PT center annex of Bay Health in Dover, DE, but this PT scheduling was conducted at the on-site DCC hospital by a man who claimed to be a physical therapist, named Sean. Sean had absolutely no access to any type of PT equipment at the DCC on-site hospital, so it is unclear how Sean intended to perform any actual PT.

130.    Sean did not have Andrus' medical file, had not reviewed Andrus' medical file or spinal injury/condition, and did not ask Andrus any questions about it.

131.    Sean also conducted a mock exam that only consisted of asking Andrus to touch his toes.

132.    Andrus attempted to do so, but when he bent over perpendicular to his legs and/or parallel to the floor, he experienced burning and stabbing pain throughout his lower back and right leg.

133.    Andrus was unable to touch his toes and Sean said: "All Right, that's fine."

134.    Sean inquired about what type of PT the previous Physical therapist had done; Andrus informed Sean.

135.    Sean directed Andrus to continue to touch his toes and to walk-not run daily as a make-shift PT routine.

136.    Andrus was surprised because the former off-site physical therapist's exam was comprehensive and the PT was customized to Andrus' particular injuries: It lasted some forty-five minutes; involved some dozen different types of physical movements, manipulations, and exercises; involved the use of various PT equipment; involved extensive review of Andrus' medical records and point blank inquiry; and it involved clear and customized directions as to what physical movements/exercises Andrus was to perform via hard copy diagrams.

137.    The 3-20-08 mock exam/PT session was completely devoid of anything that Andrus had come to expect from a professional physical therapist in the field.

138.    Sean also informed Andrus that he did not need medication for his spinal injury and that he should not expect anything stronger than "Tylenol." It is believed and therefore averred that Sean does not possess a general medical licensee to practice medicine and that his declaration was made in bad faith and with deliberate intent to harm Andrus and/or with gross reckless disregard to Andrus' known serious acute spinal injuries and acute pain and suffering.

139.    Moreover, this was a surprise to Andrus because he had not discussed the issue of medications with Sean and Sean had not reviewed Andrus' medical records.

140.    Andrus had, however, filed a formal Medical Grievance ("MG") (# 153108), on 03-12-08 that specifically claimed that CMS had refused to renew Andrus' needed Chronic-care meds, and that CMS alternatively prescribed a known ineffective and contraindicative pain med "Tylenol" to Andrus despite knowing that the Tylenol was wholly ineffective.

21

141.    This MG is still pending and had not been added to Andrus' medial file as yet, though.

142.    It appears to Andrus that the surprise scheduling with the ostensible physical therapist, Sean was
employed to obstruct Andrus' right to petition the government via grievance activity/claim and his
underlying pursuit of medical care for his serious medical condition.

143.    Consequently, CMS doggedly continued to employ the same behavior (i.e. custom/policy)
consistently and without fail from July 2005 to the present time –some 33 months- (i.e. pattern) that
repeatedly and unnecessarily caused the very predictable same results (i.e. Denial/delay…CC-Meds
and/or denial of other needed adequate and consistent specialty medical care for Andrus' serious medical
condition) that CMS/Defendants knew or should have known that it would have caused the following:

        A. That Andrus' acute spinal injuries and the accompanying acute pain and suffering are an
        obvious serious medical need and/or diagnosed serious medical need that mandated adequate and
        consistent medical care;

        B. That absent adequate and consistent medical care, Andrus' serious medical need immediately
        becomes dire and/or an obvious medical emergency;

        C. That absent adequate and consistent medical care, Andrus was and is exposed to undue acute
        pain and suffering; significant impairment of his normal daily activities; and an undue,
        significant, and likely risk of cumulative residual tangible and permanent injuries and/or
        significant threat to his future health;

        D. That CMS's current and on going policy regarding Chronic-care Clinics and Nurse
        Administered CC-Meds absolutely failed to meet the dire, immediate, and emergency serious
        medical needs of Andrus, and failed to provide adequate and consistent medical care for Andrus
        and it obviously mandated affirmative corrective action;

        E. That by continuing to employ said custom/policy, CMS constructively precluded Defendant
        physicians from the ability to exercise sound professional medical judgment regarding Andrus'
        serious medical needs;

        G. That CMS's continued employment of said custom/policy caused an obvious continuing
        violation of Andrus' right to be free from cruel and unusual punishment and did cause Andrus to
        experience repeat and pervasive Denials/delays…CC-Meds, which caused significant and
        cumulative constitutionally impermissible adverse pain and suffering; and

        H. That CMS's dogged pursuit and/or employment of said custom/policy would likely violate
        Andrus' constitutional rights.

144.        Defendants above at paragraph # 13 intentionally or with gross reckless disregard
exposed Andrus to undue pain and suffering, permanent injury, and a significant risk of future
serious/fatal harm.

145.        In addition, sometime in July/August 2007, Van Dusen inexplicably and in bad faith
substituted the semi-effective CC-Meds combination for another pain med (i.e. Mobic), which

22

Van Dusen knew or should have known was less efficacious and contraindicative to Andrus' chronic HCV. Mobic's manufacture also posts warnings of a marked incidence of heart attack and stroke associated with Mobic's use; warns against any elderly or impaired health from taking Mobic, anyone with a history of alcohol or drug abuse, and/or anyone who suffers heart of blood vessel problems from using Mobic.

146.     Van Dusen knew Andrus is elderly, in poor health, (e.g. chronic HCV and hypertension), has a history of alcohol and drug abuse, and has heart problems. Thus he knew or should have known that substituting the prior CC-Meds combination –which was not contraindicative- with Mobic was both ineffective and contraindicative for Andrus and would cause significant and likely threat to Andrus' future health and/or cause permanent injuries.

147.     Moreover, Van Dusen mislead Andrus into believing that the Mobic was a more powerful pain reliever and would thus be more effective than Andrus' current pain reliever Elavil or Ultram, but Van Dusen knew this too was false.

148.     For example, CMS categorizes the more powerful and potentially abusive Elavil and Ultram as Nurse Administered Medications, which is monitored by Security Staff to ensure that no abuse occurs. Alternatively, less powerful and/or abusive medications (e.g. Tylenol, Motrin, and Mobic), are categorized as "Keep On Person" and as such a CC-patient receives a blister pack medication card to keep in his room. Thus, the patient is responsible to take his KOP CC-Meds. Said Mobic was not a Nurse Administered CC-Med but was actually categorized as an over-the-counter KOP Cc-Med.

149.     Thus Vandusen knew or should have known the Mobic was less efficacious than the Elavil or Ultram and would consequently cause Andrus undue pain and suffering.

150.     Van Dusen intentionally and/or with gross reckless disregard to Andrus' serious medical conditions prescribed Andrus the known less efficacious and contraindicative CC-Med (i.e. Mobic), which was clearly contrary to any legitimate medical factors, and this was likely to inflict impermissible permanent harm and a significant risk of future permanent injuries to Andrus.

151.     Andrus did not request any substitute pain medication- only requested that his CC-Meds be Reordered- and only acquiesced because of Van Dusen's false and misleading representations.

152.     It is believed and therefore averred that Van Dusen's false and misleading representations were but a bad faith pretext designed to realize CMS's custom/policy of achieving constitutionally impermissible non-medical factors such as, but not limited to, cost-avoidance.

153.     Van Dusen's Mobic order was effective from 08-20-07 to 11-18-07.

154.     Shortly after beginning the Mobic, Andrus predicable began to experience acute adverse effects (i.e. stomach and bowel distress, significant and recurring chest pain, and numbness and tingling in his left are and hand).

155.    Additionally, the Mobic clinically proved wholly ineffective at managing Andrus' acute pain and suffering.

156.    In October/November 2007, Andrus filed two formal Sick-call Requests and alerted CMS (i.e. DCC Hospital Staff) of his recurring chest pain, etc. Andrus thus gave notice of classic symptoms associated with a heart attack or stroke –which was of course, one of the manufacture's posted Warnings regarding Mobic's use.

157.    CMS intentionally failed to inquire and/or conduct reasonable follow up into Andrus' complaint of chest pains and did aggravate the gross reckless disregard and deliberate indifference.

158.    For instance, on 10-29-07, Andrus had filed a formal SCR that also noted "chest pain," and CMS's response to said classic symptom of a serious medical condition was to dismiss it as an "Old Sick call slip. Doctor seen 11-15-07." Clearly the 10-29-07 SCR was ignored and held until after 11-15-07, because CMS could not have made such a response unless it was so.

159.    CMS's deliberate indifference was underscored by Defendant Jane Doe "KC's" overt callous and malicious, and gross reckless disregard to Andrus' SCR (i.e. notice of chest pains on 11-09-07), in which "KC" stated the following:

        Rec'd 11-14-07 at 9:30[.] [A]re you having chest pain or do you just
·       want your pain meds renewed[.] You are being scheduled to see
        [I] nfection control—KC [(i.e. viral disease doctor)]

160.    The so called infectious disease control doctor has absolutely nothing to do with chest pains, heart attack or strokes in any way, shape, or form.

161.    On 1-16-08, Andrus filed another SCR due to numbness and tingling in his left arm and hand.
162.    Subsequently, Andrus received an EKG, but he believes it was unrelated to any of his SCRs because there was no mention or follow up of said SCR (i.e. chest pains, etc), and also because EKGs are part of the standard HCV initial protocol that Andrus was ostensibly enrolled in.

163.    In any event, Van Dusen notified Andrus that the EKG showed evidence of a recent heart attack and/or coronary event. Van Dusen said nothing more; nothing about any follow up treatment; and no directions for Andrus.

164.    It is believed and therefore averred that the known less efficacious and contraindicative Mobic was the proximate and actual cause of Andrus' heart attack and/or the resulting permanent damage to his heart, and that Defendants knew or should have known of this significant and likely risk to Andrus.

165.    Also, CMS Van Dusen, and "KC" intentionally failed to address the immediate needs of Andrus, and did disregard with gross recklessness, the obvious and classic symptoms of Andrus' heart attack and this was contrary to the known legitimate medical factors.

Count II: Denial of Reasonably Adequate Medical Care For Andrus' Fatal Hepatitis Disease

166.    Defendants CMS and McDonald intentionally or with gross reckless disregard to Andrus' known and/or obvious serious medical condition, **denied, inordinately delayed, or knowingly provided less efficacious and/or contraindicative medical care** for Andrus' Hepatitis C/Liver Disease and its residual tangible injuries. Defendants' acts or omissions were contrary to legitimate medical factors and did cause Andrus undue, significant pain and suffering, residual tangible injuries, likely significant threat of future health, and permanent injuries to his vital internal organs. (e.g. Liver, Kidneys, etc).

167.    Andrus' HCV is well documented and known by Defendants to be a serious medical condition, because of the following:

   a.   It has been diagnosed by a physician, and because it is known to be both fatal and an incurable disease, it clearly requires significant, continuous, and consistent medical care/specialty care;

   b.   It has been documented via multiple Sick-call referrals, medical grievances, and Defendants have responded and acknowledged same as a serious medical condition;

   c.   Andrus has been enrolled in the Chronic-care Patient program due to the permanent, serious, and chronic nature of this serious medical condition; and

   d.   Because Andrus is a high risk HCV patient (i.e. high risk due to advanced age, most difficult geno-type to treat, advancing rate of negative liver function numbers, chronic condition...) and because Andrus is in poor health (i.e. acute serious spinal injuries –that requires significant and continuous medications, some of which are proscribed as contraindicative due to the HCV; hypertension and compromised hearth or coronary system), all of which mandate immediate, aggressive Hep C therapy in order to offset the high risk of a lost chance of recovery/Hep C therapy and/or the continued proscription of necessary CC-Meds for Andrus' serious spinal injuries.

168.    For example, initial Hep C protocol and risk factors are as follows:

a) Blood tests ("labs"), etc are employed to diagnose HCV/CDL and the critical factors include:

i. *Decreasing platelet counts* –normal 140-400- with below 140 indicative of HCV/CDL;

ii. *Increasing liver enzymes* –normal AST is 2-50 and ALT is 2-60- with numbers above the high ends respectively indicative of HCV/CDL;

iii. Elevated viral load –normal below 1 million, but counts above one million indicative of HCV/CDL;

iv. Test for tumor markers to rule out liver cancer;

25

v. Test for HCV genotype is conducted to determine a *patient's treatment difficulty type*; and

vi. Presence of HCV for over six months indicates positive diagnosis and is then raised from "acute" to "Chronic;"

b) The identifying factors for high risk/chronic cases:

i. Patient s over 40 years of age *(Andrus is over 50);*

ii. Patients with most difficult genotype (Andrus is also the most difficult geno-type);

iii. Patients who had relatively stable liver enzymes or platelets counts, but which begin to increase their rates of negative progression (Andrus' *numbers were indicative of HCV in 2004 & 2005;*

iv. Patients who experience persistent and/or rapidly increasing viral load counts (Andrus' *viral load count was less than half a million back in 2004 (circa) but has increased to well over one million currently.*

c). The minimal medical requisites for HCV diagnosis/treatment for a high risk/chronic case:

    i.   A Referral to a gastroenterologist or hepatologist;

    ii.   Perform labs for a baseline and damage assessment (e.g. liver viral load, liver enzyme and platelet count, tumor markers, and HCV genotype*;*

    iii.   Liver biopsy to determine damage to liver;

    iv.   EKG, Chest X –ray, and eye exam; and

    v.   Provide Interferon/Ribavirin therapy education of the likely benefits and risks of HCV therapy.

For instance, if diagnosed with HCV, the hepatologist is required to explain to the patient the following:

    i.           Amount of liver damage present (CMS/McDonald have never disclosed to Andrus the level of liver damage/cirrhosis);

    ii.           Patient's risk category and chances of successful HCV treatment (CMS/McDonald have never disclosed to Andrus this either); and

    iii.         The risks and benefits in beginning HCV treatments (i.e. Interferon/Ribavirin) (CMS/McDonald have never disclosed this either to Andrus as required).

169.   In short, Andrus's chronic HCV (i.e. fatal disease) mandates immediate, aggressive HCV therapy (i.e. Interferon/Ribavirin therapy), but defendants CMS/McDonald continue to intentionally deny the needed HCV therapy –contrary to known, legitimate medical factors- and have established a impermissible custom/policy that is substantially likely to cause Andrus undue pain and suffering, permanent injuries, a lost chance of recovery, end-organ failure, and premature death.

170.   For example, in 2004 Affiant was diagnosed with acute Hepatitis C/Liver Disease ("HCV") and Andrus received a liver biopsy.

171.   The liver biopsy confirmed Andrus' HCV diagnosis and indicated at that time that he had **Stage 2** "moderate" fibrosis, which is worse than Stage 1 Portal Fibrosis.

172.   The Center for Disease Control ("CDC"), recommends antiviral therapy (i.e. Interferon/Ribavirin) for any HCV patient with the following:

a. Persistently elevated ALT liver enzymes levels,

b. Detectable HCV RNA longer than a six month period, and

c. A liver biopsy that indicates either Portal or bridging fibrosis, or at least moderate degrees of inflammation.

173.   Since Andrus' 2004 biopsy, his blood labs have shown persistently elevated ALT levels.

175.   Andrus has exceeded the CDC's prerequisites to begin HCV therapy and legitimate known medical factors mandate immediate, aggressive Hep C therapy for Andrus.

176.   Andrus has filed multiple medical grievances ("MG") requesting that CMS provide the HCV therapy, but CMS has to date refused to provide and/or complete the initial HCV protocol and thus denied him the HCV therapy.

177.   Andrus recently filed another MG requesting the HCV therapy between 03-15-08 and 03-17-08 and CMS scheduled him to meet with the viral infectious disease doctor, McDonald.

178.   On 03-22-08 Andrus met McDonald and McDonald made several false and contradictory statements in an effort to mislead Andrus into believing his HCV did not require the mandatory therapy.

179.   McDonald's statements were in conflict with Andrus' legitimate known medical factors.

180.   For example, McDonald falsely stated that Andrus' HCV was "not that bad," falsely stated that Andrus' HCV was only in "Stage One," however, according to Andrus' 2004 liver biopsy, he was already in **Stage Two** back then and because the HCV has remained in his system more than six months, it is defined/advanced to the **Chronic Stage** now, as opposed to the initial Acute.

181.   McDonald stated Andrus' liver enzymes were fluctuating, but refused to disclose if they were nevertheless "persistently elevated," which is the only remaining requisite needed that would mandate HCV therapy.

183.   Andrus subsequently learned that his liver enzymes were indeed persistently elevated.

184.   Consequently, Andrus' known fatal HCV mandates immediate, aggressive therapy, but CMC continues to employ a custom/policy to deny and/or create an inordinate and unnecessary delay in providing Andrus the needed HCV therapy; however, contrary to legitimate medical factors.

185.   McDonald employed these false and misleading statements to support his decision to deny and/or inordinately delay providing Andrus a liver biopsy for another "year." (i.e. deny HCV therapy). This is contrary to known legitimate medical factors, and it is evidence of McDonald's complicity in employing

CMS's custom/policy to deny Andrus desperately needed medical care- care which every day of denial results in permanent damage to vital organs and does result in end organ failure and premature death.

186.    There is no legitimate medical factor present that would explain why McDonald would refuse to follow the well established HCV protocols, refuse to begin Andrus' HCV therapy, and/or intentionally make false representations and mislead Andrus regarding his HCV, especially in view of Affiant's chronic condition and advanced age. (i.e. Intentionally ignored known and obvious legitimate medical factors)

187.    McDonald also did not note Andrus' recent blood labs that showed elevated ammonia levels, and which demonstrates tangible aggravated symptoms of high and damaging HCV activity.

188.    Andrus informed McDonald of these March 2008 blood labs and the high ammonia levels, but McDonald callously dismissed this otherwise objective medical factor.

189.    Andrus then requested pain meds for his Chronic spinal injury.

190.    McDonald promptly attempted to prescribe a known contraindicative pain-med (Tylenol) and Andrus exploded: "What are you trying to do to me, Kill Me!" "You should know I can't have Tylenol." "All the drug info. I've read clearly warns against it for any one who suffers HCV or liver disease."

191.    McDonald became visibly nervous and stated: "Well, you can take up to a certain amount."

192.    Andrus retorted: "If it's bad for my already damaged liver –and since it is wholly ineffective at managing my high level of pain- then why should I risk taking any Tylenol at all?"

193.    McDonald then noted that Andrus had been prescribed Ultram previously and more importantly McDonald noted that the Ultram is not contraindicative to Andrus' HCV and thus could be prescribed.

194.    Andrus replied that it was a relative gauge because his pain was constant under any condition/med, but that the Ultram was the most effective thus far and that it would be fine.

195.    McDonald explicitly represented to Andrus that he would place an Order to renew the prescription for Andrus to receive Ultram.

196.    Andrus' present sense impression of McDonald's comments regarding the Tylenol was that he was surprised and shocked that Andrus was aware Tylenol was contraindicative and it embarrassed McDonald.

197.    Also, Andrus knew McDonald's other statements were false regarding Andrus' HCV Stage and its severity, so he filed formal request to inspect his past eight blood labs and the previous liver biopsy in order to determine whether his ALT numbers have been persistently elevated. Consequently, they were.

198.    These facts thus suggest that McDonald had intentionally misled Andrus in order to deny him the needed HCV therapy, however, absent any legitimate medical factors.

199.    CMS doggedly continued to employ said custom/policy consistently and without fail from 2005 to the present time (i.e. pattern) that unnecessarily results in a denial of other necessary, adequate, and consistent medical care for Andrus' serious medical condition that CMS/Defendants knew or should have known the following:

A. That Andrus' chronic HCV is an obvious serious medical need and/or diagnosed serious medical need that mandates immediate, aggressive, and adequate medical care;

B. That absent adequate and consistent medical care, Andrus' serious medical need immediately becomes dire and/or an obvious medical emergency;

C. That absent immediate, aggressive, and adequate medical care, Andrus is unnecessarily exposed to pain and suffering; and every day of denial results in permanent damage to vital organs and does result in end organ failure and premature death; and/or a significant and likely risk of cumulative residual tangible and permanent injuries and/or significant threat to his future health;

D. That CMS's current and on going policy regarding Andrus' needed HCV therapy absolutely fails to meet the immediate and emergency serious medical needs of Andrus, and fails to provide adequate and consistent medical care for Andrus and it obviously mandates affirmative corrective action;

E. That by continuing to employ said custom/policy, CMS constructively precluded Defendant physicians from the ability to exercise sound professional medical judgment regarding Andrus' serious medical needs;

G. That CMS's continued employment of said custom/policy caused an obvious continuing violation of Andrus' right to be free from cruel and unusual punishment and did cause Andrus to experience repeat and pervasive denial of needed medical care, which caused significant and cumulative constitutionally impermissible adverse pain and suffering and permanent injuries; and

H. That CMS's dogged pursuit and/or employment of said custom/policy would likely violate Andrus' constitutional rights.


## STATEMENT OF CLAIMS

**First Cause of Action**:

200.    The Acts or Omissions of defendants –at paragraph 13 above- stated in paragraphs 12, thru 165- violated Andrus' Eight and Fourteenth Amendment Right to be free from cruel and unusual punishment and the wonton infliction of pain and harm in a manner deliberate and/or with gross reckless disregard when:

A. Defendants knew or should have known that Andrus' acute spinal injuries and the accompanying acute pain and suffering are an obvious serious medical need and/or diagnosed serious medical need that mandated adequate and consistent medical care;

B. Defendants knew or should have known that absent adequate and consistent medical care, Andrus' serious medical needs immediately became dire and/or an obvious medical emergency;

29

C. Defendants knew or should have known that absent adequate and consistent medical care, Andrus was and is exposed to undue acute pain and suffering; significant impairment of his normal daily activities; and an undue, significant, and likely risk of cumulative residual tangible and permanent injuries and/or significant threat to his future health;

D. Defendants knew or should have known that CMS's current and on going policy regarding Chronic-care Clinics and Nurse Administered CC-Meds absolutely failed to meet the dire, immediate, and emergency serious medical needs of Andrus, and failed to provide adequate and consistent medical care for Andrus and it obviously mandated affirmative corrective action;

E. Defendants knew or should have known that by continuing to employ said custom/policy, CMS constructively precluded Defendant physicians from the ability to exercise sound professional medical judgment regarding Andrus' serious medical needs;

G. Defendants knew or should have known that CMS's continued employment of said custom/policy caused an obvious continuing violation of Andrus' right to be free from cruel and unusual punishment and did cause Andrus to experience repeat and pervasive Denials/delays…CC-Meds, which caused significant and cumulative constitutionally impermissible adverse pain and suffering;

H. Defendants knew or should have known that CMS's dogged pursuit and/or employment of said custom/policy would likely violate Andrus' constitutional rights;

I. Defendant CMS and relevant defendants knew or should have known that the acts and omissions averred in paragraphs 29 to 41, 79 to 85, and 128 to 142 did constitute constitutionally impermissible retaliation in direct response to Andrus' protected rights to petition the government for redress –both administrative and the courts- did violate his right to freedom of speech and right to seek reasonable and needed medical care absent any legitimate medical or penological reasons; and

J. Despite this knowledge, Defendants acted with conscious disregard, deliberate indifference, and/or gross reckless disregard to Andrus' known serious medical needs with an intent to harm and cause Andrus permanent injuries or a substantial likelihood that permanent injuries, undue pain and suffering, residual tangible injuries, or significant impairment of Andrus' normal daily functions would occur; however in conflict with the known and obvious legitimate medical factors.

**Second Cause of Action:** (Plaintiff's first cause of action is incorporated herein into this second cause of action):

201.    The Acts or Omissions of defendants were culpable–at paragraph 13 above- stated in paragraphs 165 thru 199- and violated Andrus' Eight and Fourteenth Amendment Right to be free from cruel and unusual punishment and the wonton infliction of pain and harm in a manner deliberate and/or with gross reckless disregard when:

A. Defendants knew or should have known that Andrus' chronic HCV is an obvious serious medical need and/or diagnosed serious medical need that mandates immediate, aggressive, and adequate medical care;

B. Defendants knew or should have known that absent adequate and consistent medical care, Andrus' serious medical need immediately becomes dire and/or an obvious medical emergency;

C. Defendants knew or should have known that absent immediate, aggressive, and adequate medical care, Andrus is unnecessarily exposed to pain and suffering; and every day of denial results in permanent damage to vital organs and does result in end organ failure and premature death; and/or a significant and likely risk of cumulative residual tangible and permanent injuries and/or significant threat to his future health;

D. Defendants knew or should have known that CMS's current and on going policy regarding Andrus' needed HCV therapy absolutely fails to meet the immediate and emergency serious medical needs of Andrus, and fails to provide adequate and consistent medical care for Andrus and it obviously mandates affirmative corrective action;

E. Defendants knew or should have known that by continuing to employ said custom/policy, CMS constructively precluded Defendant physicians from the ability to exercise sound professional medical judgment regarding Andrus' serious medical needs;

G. Defendants knew or should have known that CMS's continued employment of said custom/policy caused an obvious continuing violation of Andrus' right to be free from cruel and unusual punishment and did cause Andrus to experience repeat and pervasive denial of needed medical care, which caused significant and cumulative constitutionally impermissible adverse pain and suffering and permanent injuries;

H. Defendants knew or should have known that CMS's dogged pursuit and/or employment of said custom/policy would likely violate Andrus' constitutional rights; and

I. Despite this knowledge, Defendants acted with conscious disregard, deliberate indifference, and/or gross reckless disregard to Andrus' known serious medical needs with an intent to harm and cause Andrus permanent injuries or a substantial likelihood that permanent injuries, undue pain and suffering, residual tangible injuries, or significant impairment of Andrus' normal daily functions would occur; however in conflict with the known and obvious legitimate medical factors.

31

RELIEF REQUESTED

WHEREFOR, Plaintiff Andrus requests that the Court grant the following relief:

A.  Issue a *declaratory judgment* stating:

1.  That defendants list above knowingly and intentionally subjected Andrus to cruel and unusual punishment and wonton infliction of pain in a manner deliberated, reckless, and with gross reckless disregard to Andrus' known serious medical conditions through their acts or omissions;

2.  That defendants listed above intentionally and or with gross reckless disregard needlessly caused Andrus permanent injuries, undue pain and suffering, sever mental and emotional distress, significant impairment of Andrus' normal daily functions, loss chance of recovery, and likely and significant risk of future permanent injury or premature death;

3.  That corporate defendant CMS employed a custom/policy –not rooted in any legitimate medical factors- but actually contrary to known legitimate medical factors that caused Andrus to unduly experience acute pain and suffering (i.e. listed above at item 2 of this section);

4.  That defendants violated Andrus' protected right to petition the government for redress via grievances and/or the courts by and through adverse acts that equated to retaliation;

5.  That CMS was knowledgeable of defendant employees' acts and omissions above and that said acts or omissions were obviously likely to violate Andrus' constitutional rights; however, absent any legitimate penological or medical factors, and CMS refused to take any affirmative action to correct said violations;

6.  That CMS intentionally acted to impede Andrus' ability to bring his claims before August 15, 2006, that CMS's act/omissions were a continuing violation that cannot be compartmentalized; and

7.  That CMS and defendant employees' deception, false representations, and their employment of various illegitimate pretexts caused CMS to have dirty hands regarding any statute of limitations affirmative defenses and established constructive knowledge and/or circumstantial evidence of guilt regarding the subjective prong of deliberate indifference.

B. Issue an *Emergency Medical Injunction* Ordering the following:

1.  That CMS immediately complete the initial HCV protocols and provide the HCV therapy;

2.  Order and/or assign an Independent Infectious Disease Specialist to monitor said HCV therapy and blood work associated therewith, and to monitor for consistent CC-Meds/Clinics at CMS's expense;

3.  That CMS immediately provide orthopedic foot wear and meaningful, adequate, and consistent Physical Therapy for Andrus' serious spinal injuries; and

4.  That CMS provide an independent neurosurgery consult for Andrus' serious spinal injury and nerve damage.

C.  Award *Compensatory Damages* for violation of specified constitutional rights, undue pain and suffering, permanent injuries, permanent disfigurement, mental and emotional distress, significant deterioration of physical body and internal organs, and likely and significant risk of future injuries, disability, and or premature death according in an amount and character equivalent to what is proven at trial and is awarded jointly and or severally against all named defendants.

D.  Award *Punitive Damages* against all named defendants –both jointly and/or severally- in accord with their specific, and individual, and or conspiratorial acts of deliberated indifference, intentional acts of malice, intentional intent to harm, injure, or retaliate against Andrus, and gross reckless disregard of his acute pain and suffering, and mental and emotional distress, and or for the repeated deliberate acts of deception, bad faith, and false representations, which was employed to realize constitutionally impermissible custom/policy; and/or sufficient enough to deter the above unconstitutional act or omissions.

Respectfully Submitted,

Daryl Andrus
SBI # 101816, S-1, C-10
1181 Paddock Rd.
Smyrna, DE 19977

4/11/08
Date

33

Attachment A

**DCC  Delaware Correctional Center**                                      Date: 03/31/2008
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## GRIEVANCE REPORT

| OFFENDER GRIEVANCE INFORMATION | | | |
|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| **Offender Name :** ANDRUS, DARYL G | | **SBI#** | : 00101816 | **Institution** | : DCC |
| **Grievance #** : 154584 | | **Grievance Date** : 03/21/2008 | | **Category** | : Individual |
| **Status** : Unresolved | | **Resolution Status :** | | **Resol. Date** : | |
| **Grievance Type:** Health Issue (Medical) | | **Incident Date** : 03/21/2008 | | **Incident Time :** | |
| **IGC** : Dutton, Matthew | | **Housing Location :** Bldg S1, Tier C, Cell 10, Single | | | |

| OFFENDER GRIEVANCE DETAILS |
|---|

**Description of Complaint:**  Inmate Claims:  Andrus filed a medical grievance (153108 and 153081) and CMS personnel came to S1 unit to "Investigate" the former MG.  She did not provide her name, but the grievance report listed "Ronnie Moore" as investigator.  The investigator intentionally lied and threatened Andrus in an attempt to course Andrus to drop his medication grievance, and this prohibited act of "Reprisal" also acts to impede Andrus from pursuing his medical needs.  Specifically, she stated that if Andrus "wanted anything stronger than Tylenol, he would have to be transferred to the SHU or SNU unit.  Andrus told mental health Lea, of this and she flatly stated it was false.  Thus CMS's false threat is a prohibited "Andrus" action that exposes Andrus to intentional harm.

**Remedy Requested**    :  Prohibit CMS/ personnel from adverse/ reprisal acts against Andrus, which was directly related to his protected right to seek medical care and redress via the IGP 4.4 and the courts.  Provide and or access damages, and Identify investigator.

| INDIVIDUALS INVOLVED | | |
|---|---|---|
| **Type** | **SBI #** | **Name** |
| | | |

| ADDITIONAL GRIEVANCE INFORMATION | |
|---|---|

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 03/31/2008 |
| **Investigation Sent** : 03/31/2008 | **Investigation Sent To**    : Moore, Ronnie |
| **Grievance Amount :** | |

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/31/2008

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION |
|---|

| Offender Name : ANDRUS, DARYL G | SBI# | : 00101816 | Institution | : DCC |
|---|---|---|---|---|
| Grievance #    : 154584 | Grievance Date : 03/21/2008 | | Category | : Individual |
| Status         : Unresolved | Resolution Status: | | Inmate Status : | |
| Grievance Type: Health Issue (Medical) | Incident Date | : 03/21/2008 | Incident Time : | |
| IGC            : Dutton, Matthew | Housing Location :Bldg S1, Tier C, Cell 10, Single | | | |

| INFORMAL RESOLUTION |
|---|

**Investigator Name**   : Moore, Ronnie                                    **Date of Report** 03/31/2008

**Investigation Report :**

**Reason for Referring:**

Offender's Signature:_____

Date                    :_____

Witness (Officer)    :_____

Page 2 of 4

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/31/2008

## GRIEVANCE INFORMATION - IGC

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** ANDRUS, DARYL G | **SBI#** : 00101816 | **Institution** : DCC |
| **Grievance #** : 154584 | **Grievance Date** : 03/21/2008 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 03/21/2008 | **Incident Time :** |
| **IGC** : Dutton, Matthew | **Housing Location :** Bldg S1, Tier C, Cell 10, Single | |

### IGC

**Medical Provider:**                              **Date Assigned**

**Comments:**

Medical portion accepted, grievance office does not give monetary damages.

[ ] **Forward to MGC**        [ ]  **Forward to Medical Provider**        [ ]  **Warden Notified**

[ ] **Forward to RGC**        **Date Forwarded to MGC :**

[ ] **Offender Signature Captured**        **Date Offender Signed**        :

Attachment B

Darryl Andrus
SBI # 101816, S-1, C-10
1181 Paddock Rd.
Smyrna, DE 19977

March 17, 2008

Ombudsman, CMS Delaware Offices
RE: Notice of Continuous Chronic Care Medication Interruptions & Contraindicative Medications

Ombudsman:

I am providing this Notice to CMS as a final hope to realize corrective action. First, CMS has and continues to cause repeat and prolonged interruptions in my Chronic Care Medications ("CCMI"). I have received various medications since 1996 (circa) for a spinal injury I sustained from a gunshot wound: pain relievers, nerve medications, and muscle relaxers. I also suffer chronic Hep C/Liver disease. My spinal injury requires continuous meds in order for me to function even at a substantially impaired level. However, when CMS causes an interruption in these meds and/or provides a less efficacious medication; I am rendered incapacitated with excruciating pain and impairment. CMS caused another avoidable and unnecessary CCMI recently -lasting over two weeks- earlier this month. DCC Staff and my mother were forced to intervene on my behalf, but the matter was not corrected and in fact it was aggravated.

For example, doctor Vandusen conducted a belated Clinic on or about 03-05-08. This Clinic was supposed to Reorder my interrupted meds, but Vandusen only reordered the muscle relaxers and the nerve medications. Alternatively, Vandusen unilaterally and without notice substituted my previous pain medication (i.e. Ultram), which is merely semi-effective, for a wholly ineffective over-the-counter pain medication (i.e. Tylenol). Not only is the Tylenol woefully ineffective, but it is known to be a prohibited class (i.e. NSAIDS), of pain relievers for anyone, like me, with chronic Hep C/Liver Disease (i.e. contraindicative). Vandusen is intimately aware of my Hep C disease, and in fact, he noted that I had shown high ammonia levels as indicated from my most recent blood labs. Vandusen noted this fact at the very same Clinic. Nevertheless, Vandusen altered my pain medications for the Tylenol and knowingly aggravated my Hep C/Liver Disease and Vandusen is exposing me to unnecessary pain and suffering by discontinuing the Ultram.

Moreover, this is disturbing because it is not the first time Vandusen has prescribed an inferior medication in direct view of contraindicative symptoms and/or in conflict with known medical warnings! For instance, back in August 2007, Vandusen conducted a Clinic for the same matter (i.e.

1

spinal injury/CC Meds), and despite reviewing a recent EKG during the very Clinic, which indicated evidence of a cardiac event (e.g. mild heart attack), Vandusen again altered my prescription for Ultram and substituted it for another ineffective drug (i.e. Meloxcam/Mobic). This particular pain reliever is not only a contraindicative NSAID, however, but it is known to "Increase the Risk of Heart Attack." Indeed, the manufacturer specifically warns against taking Mobic for anyone who has had any prior cardiac related problems. Again, Vandusen noted the irregular EKG, but promptly prescribed Mobic. This was sure to aggravate my known condition. In fact, shortly after beginning the Mobic, I began to experience dramatic chest pain and on 10-29-07 I returned the Mobic to Vandusen. My Sick Call for chest pain was perfunctorily dismissed and I was accused of faking the chest pains, which we know were warned against and an inevitable cardiac response due to my irregular EKG.

Consequently, Vandusen altered my prescription from Ultram –which thus far has provided some relief from the excruciating pain- and alternatively prescribed a known contraindicative pain med; and more alarming, is that on both occasions I exhibited clear warning symptoms that prohibit Vandusen's specific alternate medications. This suggests intent to harm and/or a gross reckless disregard to the known legitimate medical factors.  This is unacceptable and it requires immediate corrective action.

In closing, I returned the contraindicative and less efficacious Tylenol, and once again CMS has denied me my needed pain medications. I have repeatedly grieved this matter to no avail. I require immediate corrective action: (1) namely that CMS provide Ultram or another equally effective pain medication until a Reorder can be realized; (2) that the Clinics are conducted in a timely fashion in order to correct the pervasive and on going medication interruptions; and (3) I require that no further alterations in my prescriptions occur without my knowledge and consent, and only then when a valid medical factor mandates the alternative. I look forward to CMS's response. I thank you for your time and consideration in this matter.

Respectfully,

Darryl Andrus

C.C. Commissioner of Corrections, Honorable Carl Danberg
     Independent Monitor, Honorable Mr. Martin
     Audrey Andrus

2

Attachment C

# CMS

**DEDICATED PEOPLE
MAKING A DIFFERENCE**

Correctional Medical Services

March 28, 2008

Darryl Andrus
S-1, C-10
1181 Paddock Road
Smyrna, DE 19977

SBI # 101816

Mr. Andrus,

I am writing in reference to your letter dated March 17, 2008, received in the Regional office on March 20, 2008.

After a review of your medical records, I am unable to locate the lapse in medication delivery for the month of March. Documentation shows that you were in receipt of your Keep on Person (KOP) medication on 3/3, 3/6, and 3/11. The medications that are nurse administered show no lapse in delivery.

You write in the second paragraph of your letter that your Chronic Care Clinic (CCC) visit was belated; however, you were seen on November 15, 2007 with a follow up appointment scheduled for 90 days per your physician. Your March 5 appointment was actually prior to the 90 day follow up.

You also write that the physician did not order any of your medications; however, a review of your medical records notes that the physician ordered Lactulose (noted that you refuse), Atenolol, Baclofen, Neurontin, and Tylenol.

Ultram is no longer available to patients. Tylenol is not in the drug classification for NSAIDS, it is **classified as an analgesic and antipyretic** and when taken as directed by your physician it is safe to take with a chronic illness such as hepatitis. There is no documentation that supports that Tylenol was returned to medical or a refusal noting you would take the medication.

You have also been scheduled to see a physical therapist and did not show for your appointment on 3/20, your next appointment is scheduled for 3/27. Mr. Andrus physical therapy was prescribed for some of the issues you outlined in



your letter and you need to attend the appointments for evaluation and treatment or sign a refusal for care and follow up with your physician.

Please feel free to contact me in the future with any questions or concerns regarding your medical care.

Sincerely,

Tracy Wilkins, RN, CCRN
Regional Ombudsman
Correctional Medical Services

Delaware Regional Office
1201 College Park Drive
Suite 101
Dover, DE 19904
302-674-8281 • 302-674-3693

NM: DARYL G. ANDRUS
SBI#: 101816    UNIT: S-HC-10
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

UNITED STATES POSTAGE
$ 04.800
MAILED FROM ZIP CODE 19977

U.S. District Court
844 King St
Lockbox 18
Wilmington, DE 19801-3507