IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DARYL ANDRUS, | ) | |
| Plaintiff, | ) | |
| v | ) | C.A. _____ |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) | |
| Defendants. | ) | |

FILED
APR 30 2008
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

MRMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION FOR EMERGENCY MEDICAL CARE DUE TO IMMINENT DANGER AND HARM

Statement of Case

This is a civil rights action brought under 42 U.S.C., section 1983 & 1197. Andrus also invoked pendent jurisdiction to hear any subordinate state tort claims under 28 U.S.C. section 1367. Andrus is a state prisoner and pro se litigant who has filed under informa pauperis filing status. Andrus seeks the instant injunction (PI) to ensure he receives emergency medical care appropriate for his dire medical conditions and imminent danger.

Statement of Facts

As stated in the Declaration (Decl) above, Andrus suffers from:

ACUTELY PAINFUL SPINAL INJURIES and CHRONIC HEPITITUS C / LIVER DISEASE. Both require immediate emergency medical care. (See Decl. at Sections 1 & 2).

### SECTION 1. ACUTE SPINAL INJURIES AND ACUTE PAIN AND SUFFERING, ETC

1. 1. Andrus suffers a serious spinal injury and related residual tangible injuries to his lower extremities from a gun-shot wound he suffered to his back in April 1994 (circa). Some but not all of the residual injuries include the following:
    a. Significant and persistent dysfunction of ambulatory and normal daily activities (e.g. Unable to walk, sit, stand, for periods longer than fifteen or twenty minutes at a time; acute insomnia and sleep disruption; unable to lift or move weights in excess of ten pounds; etc);
    b. Partial paralysis of his right leg and foot at the L 1 level;
    c. Depression and anxiety;
    d. Multiple trauma to spine (i.e. L 1, L 2, and fusion of L 1 to L 3);

1

    e. Continuous, excruciating pain –sharp, stabbing, and burning pain throughout right leg and foot- and acute, sudden and violent involuntary muscle spasms in and about right leg and foot ("acute muscle spasms");

    f. Fusion and scar tissue from bone graft over right pelvis; and

    g. Significant impairment of lower extremity strength (i.e. two fifths strength –proximity- in right leg with a drop foot gait on right side). ("serious spinal injury or injuries" shall reference items a. thru g. of this paragraph).

2. In order for Andrus to manage the continuous, excruciating pain and sudden, acute and violent involuntary muscle spasms, Andrus requires significant, adequate, and continuous medications for his serious spinal injuries. (e.g. pain relievers "Elavil/Ultram" and muscle relaxers "Soma" since 2001, and nerve damage meds "Neuroton" since 2006) ("CC-Meds"), Even with uninterrupted CC-Meds, Andrus is still partially disabled; however, **when Andrus is denied any dosage of any one of these needed CC-Meds, it renders him completely disabled and incapacitated due to the continuous, excruciating pain and acute, sudden and violent involuntary muscle spasms.**

3. Andrus' serious spinal injuries are well documented and known by Defendants to be a serious medical condition, because of the following:

    a. They have been diagnosed by multiple physicians as requiring significant and continuous CC-Meds, physical therapy, and other specialty care;

    b. They have been documented via multiple Sick-call referrals, medical grievances, and Defendants have responded and acknowledged same as a serious medical condition;

    c. Andrus has been enrolled in the Chronic-care Patient program due to the permanent and serious acute nature of his serious medical condition; and

    d. Andrus' serious spinal injuries - excruciating pain and acute muscle spasms- are so obvious that even a layman could easily discern the need for a doctor's immediate attention.

4. Indeed, when CMS denies Andrus any dose of said CC-Meds (i.e. interrupts CC-Meds) or they are substituted for less efficacious or contraindicative medications, his condition immediately becomes a dire emergency -due to the acute pain and suffering, and significant impairment of his normal daily activities- and he consequently experiences the following: Andrus becomes incapacitated and bed ridden; he is often unable to walk to the central meal hall and retrieve his meals and is thus forced to skip many of his meals; he is unable to sleep, stand, walk, sit, or move about without experiencing debilitating and incapacitating pain; he experiences acute muscle spasms that expose him to falling or collapsing incidents and likely

2

future injury; and he simply cannot function as any normal person would. This level of continuous and excruciating pain is substantially similar to torture and does cause Andrus significant mental and emotional suffering and mental and physical exhaustion in addition to the above stated acute pain and suffering. ("**acute pain and suffering**").

5. Lack of adequate and consistent medical care unnecessarily exposes Andrus to unacceptably high and likely risks of permanent disability and/or fatal or serious injuries in the following manner:

   **A)** *Likely and Substantial Risk of Serious Falling Incidents*: Andrus has already suffered additional permanent injury due to a related serious falling incident that caused his L5 to totally collapse. The falling incident occurred on or about mid-to-late 2001, and it was caused when Andrus experienced one of his frequent acute muscle spasms in his right leg. It in turn caused his leg to involuntarily and uncontrollably contract upwards like a folding jack-knife closing in on itself and up into his chest area. At this time, Andrus was not receiving any muscle relaxers or nerve damage treatments (i.e. medications), but only received pain meds as part of his CC-Meds. Andrus would experience such muscle spasms repeatedly and frequently throughout the day and night. Indeed, they would frequently jolt him wide awake in severe pain and only permitted Andrus a few forty-five minute increments of sleep a night, which totaled approximately 3-4 hours per evening. This is well known. Accordingly, Andrus was exposed to violently flipping out of his bunk, Prison Officials wrote an Order mandating that Andrus must always be provided a "Bottom Bunk," which of course is closer to the concrete floor and presumably less dangerous upon falling.

   This particular serious fall, however, caused Andrus to be hospitalized for ten days under heavy sedation/medications. First Correctional Medical ("FCM") refused, however, to render any diagnostic tests that were needed to diagnose any additional spinal injuries (e.g. X-ray, MRI, etc). FCM did add the obviously necessary muscle relaxer "Soma" and nerve meds to Andrus' CC-Meds combination. (i.e. Soma and Elavil, etc). Said combination clinically proved a marked improvement. Andrus still suffered repeat muscle spasms, though they were less frequent and less in duration and severity. In short, with adequate and consistent CC-Meds treatment, Andrus was able to manage his pain and suffering.

   Andrus received a subsequent MRI. The MRI revealed that the L 5 of Andrus' spine was completely collapsed. Prior to said serious falling incident/injury, Andrus' L5 showed no damage and Andrus had not re-injured his back or spine since his 1994 neurosurgery except for this serious falling incident.

Thus, the actual and proximate cause of Andrus' permanent L 5 injury was the –untreated- acute muscle spasm. Moreover, during this period Andrus had significant nerve damage and numbness, but as time progressed (i.e. currently), Andrus actually suffers greater pain and more intense and frequent muscle spasms, because his right leg/foot and the nerves that serve them are finally beginning to heal and what was once dead and numb is now alive and acutely painful. Any Denial/delay…CC-Meds that CMS causes Andrus greatly aggravates his acute pain and suffering.

**B)** *Incredible Stress & Strains Upon Andrus' Compromised Heart and Poor Health*: Andrus also suffers chronic hypertension and a recent EKG showed signs that he suffered a recent hearth attack. Any time CMS Denied/delays…CC-Meds for Andrus' acute and serious spinal injuries he immediately experiences "acute pain and suffering" that wreaks havoc and incredible strain upon his physical, mental, and emotional person.

The following is an example:

- Stresses his already compromised heart;
- Spikes his already chronic hypertension, which in turn may cause likely further damage to his compromised heart and/or his kidneys;
- Causes significant sleep disruption, which weakens his immune system and thus aggravates his chronic Hep C/liver Disease ("HCV"), and causes Andrus to suffer acute irritability, hostility, anxiety, paranoia, depression, chronic fatigue, and frustration (i.e. significant mental and emotional distress); and
- It significantly impairs Andrus' ability to promote good health via exercise and/or realize much needed physical therapy for his spinal injuries.

**C)** Lastly, because CMS has routinely denied Andrus his needed CC-Meds and caused him to unnecessarily experience undue pain and suffering and acute, sudden and violent muscle spasms, his necessary physical therapy has been substantially impaired –so much so- that much of his previous progress has been retarded. This aggravates Andrus' already significantly impaired normal daily functions and it is unnecessary.

Andrus' acute pain and suffering produces continuous, incredible, and unbearable strain upon his physical and mental person. And it is so obvious, and/or documented and tangible, that any layman would recognized the need for immediate medical attention any and every instance that CMS causes a Denial/delay…CC-Meds for Andrus.

6. Andrus' serious spinal injuries continues to require said CC-Meds, however, Defendants routinely deny it, or cause repeat inordinate delays and/or Defendants knowingly provide Andrus less efficacious and/or

contraindicative medications. ("**Deny/delay…CC-Meds**"). These acts or omissions expose Andrus to said acute pain and suffering; however, absent any legitimate medical reasons.

Significant impairment of Andrus's normal daily functions shall mean the following: (a) A substantial impairment in his ability to walk, stand, sit, run for more than twenty minutes at a time; (b) A substantial impairment of his ability to lift or carry nominal weights exceeding ten pounds; and (c) A substantial impairment in his ability to bath, sleep, work, and/or promote good health via meaningful exercise or perform necessary physical therapy.

## SECTION 2. CHRONIC HEPITITUS C / LIVER DISEASE

7. Andrus suffers from a fatal disease that will never heal on its own, will cause premature death and end-organ failure, and has already caused permanent injury to his liver. Moreover, Andrus has already experienced and/or is experiencing the following:

(a) Has caused or is causing significant permanent injury (e.g. At minimum stage two or possibly three of four stages of liver disease) (See Ex. A Affidavit and Relevant Paragraphs of his Complaint);

(b) Has caused or is causing significant and rapidly worsening increase in Andrus's liver enzyme levels, (Id);

(c) Has caused or is causing significant and rapidly worsening decrease in platelet levels, (See Id);

(d) Has caused or is causing significant and rapidly worsening increase viral load levels, (See Id);

(e) Has caused or is causing significant a very real and fast approaching risk of a loss chance of any recovery whatsoever, (Id);

(f) Has caused a very real and fast approaching threat of premature death. (Id); and

(g) And it aggravates Andrus' serious spinal injuries and/or it greatly impairs Andrus' ability to take certain medication needed to manage Andrus' acute pain and suffering. (Andrus incorporates items 166 thru 199 of his Complaint herein).

8. Andrus' HCV is well documented and known by Defendants to be a serious medical condition, because of the following:

　　a. It has been diagnosed by a physician, and because it is known to be both fatal and an incurable disease, it clearly requires significant, continuous, and consistent medical care/specialty care;

　　b. It has been documented via multiple Sick-call referrals, medical grievances, and Defendants have responded and acknowledged same as a serious medical condition;

　　c. Andrus has been enrolled in the Chronic-care Patient program due to the permanent, serious, and chronic nature of this serious medical condition; and

　　d. Because Andrus is a high risk HCV patient (i.e. high risk due to advanced age, most difficult geno-type to treat, advancing rate of negative liver function numbers, chronic condition…) and because Andrus is in poor health (i.e. acute serious spinal injuries –that requires significant and continuous medications, some of which are proscribed as contraindicative due to the HCV;

hypertension and compromised hearth or coronary system), all of which mandate immediate, aggressive Hep C therapy in order to offset the high risk of a lost chance of recovery/Hep C therapy and/or the continued proscription of necessary CC-Meds for Andrus' serious spinal injuries.

9. For example, initial Hep C protocol and risk factors are as follows:

   a) <u>Blood tests ("labs"), etc are employed to diagnose HCV/CDL and the critical factors include:</u>
   i. *Decreasing platelet counts* –normal 140-400- with below 140 indicative of HCV/CDL;
   ii. *Increasing liver enzymes* –normal AST is 2-50 and ALT is 2-60- with numbers above the high ends respectively indicative of HCV/CDL;
   iii. Elevated viral load –normal below 1 million, but counts above one million indicative of HCV/CDL;
   iv. Test for tumor markers to rule out liver cancer;
   v. Test for HCV genotype is conducted to determine a *patient's treatment difficulty type*; and
   vi. Presence of HCV for over six months indicates positive diagnosis and is then raised from "acute" to "Chronic;"

   b) <u>The identifying factors for high risk/chronic cases:</u>
   i. Patient s over 40 years of age *(Andrus is over 50)*;
   ii. Patients with most difficult genotype (Andrus is also the most difficult geno-type);
   iii. Patients who had relatively stable liver enzymes or platelets counts, but which begin to increase their rates of negative progression (Andrus' *numbers were indicative of HCV in 2004 & 2005;*
   iv. Patients who experience persistent and/or rapidly increasing viral load counts (Andrus' *viral load count was less than half a million back in 2004 (circa) but has increased to well over one million currently.*

   c). <u>The minimal medical requisites for HCV diagnosis/treatment for a high risk/chronic case:</u>

   i.   A Referral to a gastroenterologist or hepatologist;
   ii.  Perform labs for a baseline and damage assessment (e.g. liver viral load, liver enzyme and platelet count, tumor markers, and HCV genotype;
   iii. Liver biopsy to determine damage to liver;
   iv.  EKG, Chest X –ray, and eye exam; and

6

   v.  Provide Interferon/Ribavirin therapy education of the likely benefits and risks of HCV therapy.

10. For instance, if diagnosed with HCV, the hepatologist is required to explain to the patient the following:

   i.  Amount of liver damage present (CMS/McDonald have never disclosed to Andrus the level of liver damage/cirrhosis);

   ii.  Patient's risk category and chances of successful HCV treatment (CMS/McDonald have never disclosed to Andrus this either); and

   iii.  The risks and benefits in beginning HCV treatments (i.e. Interferon/Ribavirin) (CMS/McDonald have never disclosed this either to Andrus as required).

11. In short, Andrus's chronic HCV (i.e. fatal disease) mandates immediate, aggressive HCV therapy (i.e. Interferon/Ribavirin therapy), but defendants CMS/McDonald continue to intentionally deny the needed HCV therapy –contrary to known, legitimate medical factors- and have established a impermissible custom/policy that is substantially likely to cause Andrus undue pain and suffering, permanent injuries, a lost chance of recovery, end-organ failure, and premature death.

12. For example, in 2004 Affiant was diagnosed with acute Hepatitis C/Liver Disease ("HCV") and Andrus received a liver biopsy.

13. The liver biopsy confirmed Andrus' HCV diagnosis and indicated at that time that he had **Stage 2** "moderate" fibrosis, which is worse than Stage 1 Portal Fibrosis.

14. The Center for Disease Control ("CDC"), recommends antiviral therapy (i.e. Interferon/Ribavirin) for any HCV patient with the following:

a. Persistently elevated ALT liver enzymes levels,

b. Detectable HCV RNA longer than a six month period, and

c. A liver biopsy that indicates either Portal or bridging fibrosis, or at least moderate degrees of inflammation.

15. Since Andrus' 2004 biopsy, his blood labs have shown persistently elevated ALT levels.

16. Andrus has exceeded the CDC's prerequisites to begin HCV therapy and legitimate known medical factors mandate immediate, aggressive Hep C therapy for Andrus.

17. Andrus has filed multiple medical grievances ("MG") requesting that CMS provide the HCV therapy, but CMS has to date refused to provide and/or complete the initial HCV protocol and thus denied him the HCV therapy.

18. Andrus recently filed another MG requesting the HCV therapy between 03-15-08 and 03-17-08 and CMS scheduled him to meet with the viral infectious disease doctor, McDonald.

19. On 03-22-08 Andrus met McDonald and McDonald made several false and contradictory statements in an effort to mislead Andrus into believing his HCV did not require the mandatory therapy.

7

20. McDonald's statements were in conflict with Andrus' legitimate known medical factors.
21. For example, McDonald falsely stated that Andrus' HCV was "not that bad," falsely stated that Andrus' HCV was only in "Stage One," however, according to Andrus' 2004 liver biopsy, he was already in **Stage Two** back then and because the HCV has remained in his system more than six months, it is defined/advanced to the **Chronic Stage** now, as opposed to the initial Acute.
22. McDonald stated Andrus' liver enzymes were fluctuating, but refused to disclose if they were nevertheless "persistently elevated," which is the only remaining requisite needed that would mandate HCV therapy.
23. Andrus subsequently learned that his liver enzymes were indeed persistently elevated.
24. Consequently, Andrus' known fatal HCV mandates immediate, aggressive therapy, but CMC continues to employ a custom/policy to deny and/or create an inordinate and unnecessary delay in providing Andrus the needed HCV therapy; however, contrary to legitimate medical factors.
25. McDonald employed these false and misleading statements to support his decision to deny and/or inordinately delay providing Andrus a liver biopsy for another "year." (i.e. deny HCV therapy). This is contrary to known legitimate medical factors, and it is evidence of McDonald's complicity in employing CMS's custom/policy to deny Andrus desperately needed medical care- care which every day of denial results in permanent damage to vital organs and does result in end organ failure and premature death.
26. There is no legitimate medical factor present that would explain why McDonald would refuse to follow the well established HCV protocols, refuse to begin Andrus' HCV therapy, and/or intentionally make false representations and mislead Andrus regarding his HCV, especially in view of Affiant's chronic condition and advanced age. (i.e. Intentionally ignored known and obvious legitimate medical factors)
27. McDonald also did not note Andrus' recent blood labs that showed elevated ammonia levels, and which demonstrates tangible aggravated symptoms of high and damaging HCV activity.
28. Andrus informed McDonald of these March 2008 blood labs and the high ammonia levels, but McDonald callously dismissed this otherwise objective medical factor.
29. Andrus then requested pain meds for his Chronic spinal injury.

## ARGUMENT

THE PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCITON ORDERING EMERGENCY MEDICAL CARE TO AVOID A SUBSTANTIAL AND LIKELY RISK OF IMMINENT PERMANENT INJURIES:

A litigant is entitled to a TRO/PI upon showing the following:
1. That the Plaintiff has incurred or is likely to incur irreparable injury'
2. That the non-moving party will not be unduly harmed;
3. That the Plaintiff has a strong likelihood of success on the merits; and
4. That the TRO/PI is consistent with public interest.

(See Valentine v. Beyer, 850 F.2d 951, 955 (3d Cir. 1988), Maldonado v. Houston, 157 F.3d 179, 184 (3d. Cir 1997), and SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir. 1985)).

> IRREPARABLE INJURY

1. Andrus suffers from two serious medical conditions that have already caused him significant irreparable injuries and are also likely to cause significant future residual tangible injury –if not premature death and a likely risk of end-organ failure. Specifically, Andrus faces the following: (a) Acute pain and suffering from his diagnosed and obviously serious spinal injuries, which cause Andrus to experience significant impairment of his normal daily functions and significant deterioration of his physical being, and severe emotional and mental distress, and (b) Permanent injury via liver failure or cirrhosis, etc that will cause premature death and/or related permanent or equally fatal collateral injuries (e.g. ruptured esophagus and internal bleeding). Andrus incorporates all points above at Declaration items 2-4 and his Memorandum herein).

2. For example, Andrus's medical conditions are objectively serious and even diagnosed by competent physicians as requiring medical care. (See Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed2 811 (1994). Indeed, his acute spinal injuries and acute pain and suffering are so obvious that even a lay person could infer the need for immediate, emergency medical care. (See Foelker v. Outagamie County, 394 F.3d 510, 512-13 (7th Cir. 2005). Moreover, both conditions have been diagnosed as requiring immediate medical care and are thus deemed "serious medical" conditions under this scheme and mandate treatment. (See Estelle v. Gamble, 429 U.S 97, 105, 97 S.Ct. 285, ___, 50 L.ed2 251 (1976). Consequently, Andrus faces a likely and substantial risk of residual and tangible permanent injury due to the very emergency nature of his conditions sufficient to meet Valentine. Andrus's health land well being are the most important issue to him; however, they are not the only sources of his unnecessary suffering.

3. In addition, Andrus alleges that defendants have committed any of- but not limited to- the following violations:
    (a) Intentionally disregarded and with gross negligence denied Andrus needed care for his known and obvious medical conditions;

    (b) Intentionally disregarded and with gross negligence provided a known substandard treatment that also aggravated his preexisting condition and did endanger his life;

    (c) Intentionally disregarded and with gross negligence created an inordinate delay in providing the treatment known to be needed; however, absent any valid medical criteria and/or sound exercise of professional medical judgment.

4. Accordingly, defendants' intentional conduct and malfeasance is a clear violation of Andrus's constitutional rights in violation of the Eight Amendment's ban on cruel and unusual punishment and it does constitute irreparable harm. (See Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673 (1976)). The Elrod Court noted, in addressing medical malfeasance, that our courts are in agreement that money awards are unthinkable compensation late. (Id). This is particularly true in cases of risk to health and life as here. (See Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983)).

> ABSENCE OF HARM TO NON-MOVING PARTY

5. The balance of hardship overwhelmingly favors Andrus in this case because he faces a significant risk of imminent harm, permanent injuries, and/or premature death from his chronic HCV, and he is unduly experiencing acute pain and suffering reminiscent of torture from his acute spinal injuries. Indeed, both have been diagnosed; Andrus has been enrolled as a Chronic-care patient, and it is clear that these conditions have dangerously if not fatally progressed. Andrus's HCV is chronic and has progressed during CMS's tenure from the first stage to well beyond the second stage –approaching if not already in the third of only four stages (Fourth is chronic liver cirrhosis and normally renders one ineligible for any viable HCV therapy). Unnecessary permanent injuries are certain absent emergency medical attention for Andrus's HCV. Consequently, the present suffering of Andrus and the likely substantial risk of permanent injuries/future harm to him are enormous. Alternatively, the suffering that CMS, the contracted health service provider will experience if the Court grants the instant injunction is minimal and nothing more than what is expected of any contracted health care provider.

6. CMS's hardship amounts to nothing more than the very business that it agreed to perform when it contracted with the D.D.O.C. back in July 2005 to provided health services to the inmate population. In reality, CMS has no legitimate standing to claim otherwise, and the fact that CMS continues to deny Andrus the necessary medical care he so desperately requires, does establish CMS's deliberate indifference. Indeed, until CMS faces real hardship (e.g. fines equivalent to the wind-fall profits secured by denying needed medical care, CMS will undoubtedly continue with its business plan of employing a custom/policy of denying needed care for its charges.

> PLAINTIFFF WILL LIKELY SUCCEED ON THE MERITS

7. Andrus has a great likelihood of success on the merits, because defendants' shocking behavior is a clear violation of the constitution: Deliberate Indifference to a serious medical condition and/or deliberated reckless disregard to known serious medical needs. Defendants have no legitimate medical factor in which to justify their repeat and prolonged denials of needed medical care for Andrus's diagnosed and/or obvious serious medical conditions.

For example, defendants have engaged in any -but not limited to- the following:

a. Intentionally interfered with medical treatment that had been prescribed by a treating physician, such as by failing to provide prescribed CC-Meds; by intentionally causing repeated denials of CC-Meds between Clinics; by intentionally substituting known less efficacious or contraindicative CC-Meds for Andrus; and/or by not treating the Hep C (See Jackson v. F.C.M.S., 380 F. Supp. 387 (D. Del 2005) and Spruill v. Gillis, 372 f.3d 218, 236 (2004, and Estelle, supra));

b. By creating a continuous pattern of inordinate delay in providing needed treatment and or by employing a known systemic breakdown despite the obvious need to correct it (See Jackson, supra);

c. By employing policies that fails to meet the immediate and emergency needs of Andrus, such as during the progressively worsening HCV and acutely painful spinal injuries. (See Natale v. Camden County Corr' Facility, 318 F.3d 575, 583 (3d Cir. 2003);

d. By denying needed prescribed medications that resulted in undue pain and/or suffering or in residual injury, such as those caused by avoidable falling incidents; and the progression into the final stages of liver disease/cirrhosis. (See Monmouth County Corr. Inst. Inmates v. Fauver, 479 F. Supp 326, 347 (3d Cir. 1978) and Pace v. Fauver, 479 F. Supp. 456 (D. N.J. 1979));

e. By denying treatment that results in permanent injury, such as untreated HCV. (See White v. Napoleon, 897 F.2d 103, 111 (3d. Cir. 1990), Estelle, supra, Spruill, supra, and Monmouth County, supra));

f. By intentionally employing less efficacious treatments, however, for non-medical factors, such as budgetary restrictions and or via a custom/policy of arbitrarily deny needed medical care, which may be inferred by CMS denying Andrus HCV therapy for over a year and causing Andrus to suffer permanent injury. ( See West v. Keve, 571 F.2d 158 (3d Cir. 1978), Williams v. Vincent, 508 F.2d 541 (2d, Cir. 1974); Tillery v. Owens, 719 F. Supp. 1256, 1287 (W.D. PA 1989) aff'd 907 F.2d 418 (3d Cir. 1990); and Durma v. O'Carroll, 991 F.2d 64, 68-69 (3d Cir. 1993)); and

g. By intentionally attempting to inflict harm upon Andrus and or by doing so through gross reckless disregard to obvious painful/suffering conditions. This is demonstrated in Andrus' complaint and by his medical records in which CMS's various acts of maliciousness, hostility, sadistic, and or retaliatory behavior towards Andrus caused and/or were associated with CMS's repeated and pervasive denials of needed medical care. (See Spruill, supra at 231).

Accordingly, Andrus has properly alleged and properly supported with facts:

- Objective serious medical condition/needs;
- Which was known by defendants and; however,
- Subjectively disregarded by defendants (i.e. personal and culpable involvement/ acts).

8. Moreover, the above deliberate indifference need not await any further physical injury, though Andrus has already experienced significant permanent injury, but psychological injury also requires corrective action. (See White, supra).

> RELIEF SOUGHT WILL SERVE THE PUBLIC INTEREST

9. The public interest is best served when all ill prisoners are granted adequate health care. (White, surpa at 111)(citing Estelle v. Gamble, 4239 U.S. 97 (1976))(Prompt medical care is needed to avoid unnecessary and wonton infliction of pain). Also, the public interest is served because it is always in the public interest for defendants / prison officials to obey the law. (See Duran v. Oakland County Prosecutor's Off'. 402 F. Supp. 1379, 1393 (E.D. Mich. 1975)("the Constitution is the ultimate expression of the public interest.")).

> PLAINTIFF SHOULD NOT BE REQUIRED TO POST SECURITY

10. Andrus is an indigent prisoner and is unable to post security and he requests the Court to exercise its discretion to excuse an impoverished litigant from doing so. In view of the serious medical dangers confronting Andrus, the Court is warranted in granting the relief requested without requiring the posting of security.

## CONCLUSION

For the foregoing reasons, the Court is moved to grant the motion in its entirety.

Respectfully Submitted,

*Daryl Andrus*
Daryl Andrus
SBI # 101816, S-1, C-10
1181 Paddock Rd.
Smyrna, DE 19977

4/15/08
Date